van Gestel, J.
This matter comes before the Court on a motion by the defendants Kobrick Offshore Fund, Ltd., Kobrick Capital Management and Frederick Kobrick (collectively the “Fund” and individually for Frederick Kobrick, “Kobrick”) to dismiss all counts of the complaint of the plaintiff, Edward Marram (“Marram”), acting as Trustee of the Geo-Centers, Inc. Profit Sharing Plan & Trust (the “Plan”). The complaint contains three counts: Count I for violation of G.L.c. 110A, Sec. 410; Count II for negligent misrepresentation; and Count III for violation of G.L.c. 93A.
The facts are taken from the complaint, and also from the Confidential Private Offering Memorandum (the “Memorandum”) and the Kobrick Offshore Fund, Ltd. Subscription Documents (the “Subscription Documents”).

BACKGROUND

Marram, who has a Ph.D., is the founder, CEO and Chairman of the Board of Geo-Centers, Inc., which is a high technology and professional services firm. He also is the Trustee of the Plan. The Plan is a profit sharing plan for the employees of Geo-Centers, Inc. The defendants, the Fund, are a hedge fund, its corporate management entity, and Kobrick, the man who manages the Fund and for whom it is named. The Fund is a mutual fund incorporated in the Cayman Islands.
Marram has sued the Fund for investment losses sustained by the Plan after its investment in the Fund.
Kobrick met with Marram on December 17, 1999, prior to the investments in issue. In that meeting, Kobrick touted his investment experience and dis *497 cussed his investment philosophy. He disclosed the kinds of investments held by the Fund and talked about how he minimized the risk of investing in the Fund. Kobrick emphasized that the Fund was diversified and that high technology companies did not constitute a majority of its holdings. Kobrick stated that his investment program was appropriate for an investor who wished to preserve capital. Kobrick stated that he was able to reduce volatility in his hedge fund through appropriate investment strategies.
Marram, before making any investment in the Fund, and after his conversation with Kobrick, reviewed the Confidential Memorandum and reviewed and executed the Subscription Documents. The date of execution was January 1, 2000. At that time, the Plan invested $1,500,000 in the Fund. Three months later, on March 1, 2000, the Plan invested an additional $500,000 in the Fund.
Shortly after making its second investment, the Plan received from the Fund’s Administrator its audited financial statements for the year ended December 31,1999. These statements revealed that the Fund was not diversified but was, instead, heavily invested in high technology stocks. Further, in the report the Fund’s auditors, Ernst & Young, made the following notation:
In presenting its condensed schedule of investments, the Fund declined to present the name of each investment constituting more than five percent of net assets. Disclosure of this information is required by accounting principles generally accepted in the United States of America.
The Subscription Documents for the Fund provide that the Subscription Agreement “shall be governed, construed and enforced in accordance with the laws of the Cayman Islands . . ,”[1]
The values of the Plan’s shares in the Fund dropped during the months of March, April and May 2000. Kobrick, however, on June 6, 2000, wrote a letter to the Fund stating, “We feel strongly that this is a transition out of what has really been a long bear market for the average stock. We feel confident of our portfolio position going forward.”
By June 30, 2000, the net balance of the Plan’s investment had decreased by 34.8%. On July 7, 2000, Kobrick stated in a letter, “We believe that these losses will be recovered and there will be a resumption of good gains.” Kobrick also handwrote in the margin “This shall be a good year! Normalcy and our kind of markets are returning.” (Emphasis in original.)
By August 31, 2000, the Plan’s investment in the Fund’s Series 2 Stock had declined by 36.7% and in the Series 4 Stock by 47.9%. On that same day, Kobrick sent by facsimile a letter to Marram stating, “Our chagrin over the paper losses and embarrassing results of this quarter albeit once in a decade, is more than matched by our confidence that we will be investing going forward for maximum gains.” Kobrick also stated, “These paper losses will be recovered and there will be a resumption of good gains.”
In response to a letter from Marram in September 2000, Kobrick wrote on September 15, 2000, and attached an article in which Kobrick stated, “The long term outlook, beginning with this quarter, should be good.”
On October 16, 2000, Kobrick wrote, “It is important that we have moved from a ‘mania-driven’ market that truly plagued us, to a stock-picker’s market that is OUR kind of market and one in which we can maximize results.” In this letter, Kobrick underlined in ink the phrase “OUR kind of market.” Also, in the margin Kobrick wrote, “This is critical. Things are strongly improving.”
On October 19, 2000, Kobrick and Marram met. In this meeting, Kobrick stated that no investors had left the Fund and that new money was coming into it. Kobrick then urged Marram to maintain the Plan’s investment in the Fund. He also told Marram that the Fund was diversified, but refused to provide the Plan with a list of the Fund’s securities holdings. As a result of this meeting, the Plan maintained its investment in the Fund.
The foregoing notwithstanding, the Series 2 and Series 4 stocks were down 14.97% for the month of October 2000.
By November 30, 2000, the Plan had suffered serious paper losses, as the Series 2 Stock had declined by 60.67%, and the Series 4 Stock had declined by 67.60%. Following these results, Korbick wrote to the Plan on December 4, 2000, stating there was “reason to be optimistic about recovery and profits.” He wrote, “After a severe decline, investors give up hope, sell, and project a bad market and a bad economy. This happened in every instance, giving rise to excellent to spectacular opportunities.” (Emphasis in original.)
On December 11, 2000, Marram sent a letter to the Fund asking it to liquidate the Plan’s account. Kobrick responded by requesting that Marram reconsider until after he and Marram could meet. The meeting occurred on December 27, 2000. Again, Kobrick urged Marram to maintain the Plan’s investment in the Fund. This time, however, Kobrick promised to provide Marram with a list of the Fund’s securities holdings as well as a sector analysis. For that reason, Marram rescinded the Plan’s liquidation order.
Kobrick never produced the promised information. On April 3, 2001, the Plan liquidated its holdings in the Fund, with a loss of $1,415,210 on its $2,000,000 investment.
Because of their significance to the outcome of this motion, the Court here recites particular portions of the Subscription Documents reviewed and executed by Marram before making the Plan’s two investments in the Fund.[2] In doing so, the Court notes that there *498 are no allegations in the complaint, or in the opposition memorandum, that either document contains any untrue statement of material fact or omits to state any material fact.
The Subscription Documents contain the following acknowledgments and representations by the Plan:
The offer and sale of shares ... in Kobrick Offshore Fund, Ltd. ... is being made on the basis of the Confidential Private Offering Memorandum of the Fund.
The [Plan] agrees to, and understands, the terms and conditions upon which the Shares are being offered, including, without limitation, the risk factors referred to in the Memorandum.
The [Plan] has received and read a copy of the [Offering] Memorandum.
The [Plan] hereby agrees that by its execution of this Subscription Agreement and upon acceptance hereof by the Fund, it shall become bound by the terms of the Fund Documents.
The [Plan] acknowledges that in making a decision to subscribe for Shares the [Plan] has relied solely upon the Memorandum, the other Fund Documents and independent investigations made by the [Plan].
The [Plan] has such knowledge and experience in financial and business matters that the [Plan] is capable of evaluating the merits and risks of the [Plan’s] investment in the Shares and is able to bear such risks, and has obtained, in the [Plan’s] judgment, sufficient information from the Fund or its authorized representatives to evaluate the merits and risks of such investment. The [Plan] has evaluated the risks of investing in the Shares and has determined that the Shares are a suitable investment for the [Plan]. The [Plan] has not utilized any other person as a purchaser representative in connection with evaluating such merits and risks.
This Subscription Agreement constitutes the entire arrangement and understanding between the parties hereto regarding its subject matter, and super-cedes any prior or contemporaneous agreements, arrangements and understandings, written or oral, between the parties regarding the same.
The Offering Memorandum, at pp. 5 and 32, twice contains, among other things, the following:
Generally, Shares may be redeemed by a shareholder on the last business day of each fiscal quarter occurring on or after the end of the twelve month period following the initial acquisition of the Shares by such shareholder on 30 days prior written notice to the Fund (subject to the sole discretion of the Board of Directors to waive such notice), or at such other times, and upon such other terms of payment, as may be approved by the Board of Directors, in its sole discretion.

DISCUSSION

A Rule 12(b) motion admits all well-pleaded allegations of the complaint, and the Court must accept as true such inferences as may be drawn in Marram’s favor. Blank v. Chelmsford Ob/Gyn P.C., 420 Mass. 404, 407 (1995); Natick Auto Sales, Inc. v. Department of Procurement and General Services, 47 Mass.App.Ct. 625, 630 (1999). Of course, conclusions of law from the facts alleged are open for review on a Rule 12(b) motion. The claims in the complaint here, however, are sufficient unless they show beyond doubt that no provable set of facts would entitle Marram to relief. Warner-Lambert Company v. Execuquest Corporation, 427 Mass. 46, 47 (1998); Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68 (1992). Marram bears a “relatively light burden,” Warner-Lambert Co., supra, 427 Mass. at 47, and must be given the benefit of any doubts. Kipp v. Keuker, 7 Mass.App.Ct. 206, 210 (1979). These are “generous principles,” and the Court will apply them in the way they are intended. Connerty v. Metropolitan District Commission, 398 Mass. 140, 143 (1986).
The motion’s resolution depends to a great degree upon a proper interpretation of the language of the Offering Memorandum and the Subscription Documents. These are questions of law for the Court. Lumber Mut. Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). “In the absence of an ambiguity, [the Court] will ‘construe the words of the [Memorandum and Subscription Documents] in their usual and ordinary sense.’ ” 116 Commonwealth Condominium Trust v. Aetna Casualty & Surety Company, 433 Mass. 373, 376 (2001). The mere fact that parties disagree on the proper construction of documentary language does not necessarily establish an ambiguity. Lumbermans Mut Cas. Comp. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
Significantly here, the parties are extremely sophisticated in the matters in issue. The Plan, acting through Marram, acknowledged as much when it conceded that:
The [Plan] has such knowledge and experience in financial and business matters that the [Plan] is capable of evaluating the merits and risks of the [Plan’s] investment in the Shares and is able to bear such risks, and has obtained, in the [Plan’s] judgment, sufficient information from the Fund or its authorized representatives to evaluate the merits and risks of such investment. The [Plan] has evaluated the risks of investing in the Shares and has determined that the Shares are a suitable investment for the [Plan]. The [Plan] has not utilized any other person as a purchaser representative in connection with evaluating such merits and risks.
Thus, here — perhaps more than in situations in which there is a disparity in bargaining power or a general lack of sophistication about the matter at *499 hand — where knowledgeable parties choose to base their relationship on detailed and carefully crafted written instruments, they are entitled to and should be held to the course they chose. The Court should be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the controlling instruments that are specifically anticipated and addressed within them overwhelm or change the significance of the documents themselves.
The Plan, through Marram, also acknowledged its lack of reliance on anything other than the Memorandum, the Fund Documents and its own independent investigation in making the investments. It agreed that:
The [Plan] acknowledges that in making a decision to subscribe for Shares the [Plan] has relied solely upon the Memorandum, the other Fund Documents and independent investigations made by the [Plan],
This Subscription Agreement constitutes the entire arrangement and understanding between the parties hereto regarding its subject matter, and super-cedes any prior or contemporaneous agreements, arrangements and understandings, written or oral, between the parties regarding the same.
Knowledgeable investors like Marram know exactly what those words mean. Effectively, Marram agreed that he was not relying on anything other than what is written in the Memorandum and Subscription Documents, including in particular any oral arrangements and understandings between the parties, when he made the two investments in issue. The language is intended to eliminate, as much as words can do, any uncertainties or situations affecting the investments that anything prior to their happening might cause. There is no reason for including such language in the Subscription Documents other than to make absolutely clear what was relied upon and what was not.
The Supreme Judicial Court in Bates v. Southgate, 308 Mass. 170, 182 (1941), held that “contracts or clauses attempting to protect a party against the consequences of his own fraud are against public policy and void where fraud inducing the contract is shown . . .” In Bates a stock broker purchased certain shares of stock from another brokerage house and shortly thereafter received a confirmation slip reciting, among other things, “In making this transaction, we make no representation other than to identify the securiiy and state the price.” Bates was familiar with such confirmation slips and, in fact, used them himself with his own customers. There was evidence from which the jury could — and apparently did — find that there was fraud inducing Bates to buy the stock from Southgate and Company.
Near the end of the Bates opinion, at p. 183, the court said: “Nothing herein said affects any evidential value of exculpatory clauses or agreements as tending to show that no extraneous representations were in fact made, or if made that they were not relied upon.” Nearly 60 years later, the Appeals Court in Sound Techniques, Inc. v. Hoffman, 50 Mass.App.Ct. 425 (2000), wrestled with the extent and reach of the Bates holding. In Sound Techniques the Appeals Court drew a distinction between negligent rather than deliberate misrepresentation. In reaching its determination to enforce an integration clause, the Appeals Court said, at pp. 433-34:
There is nothing in the evidence before us that shows or even suggests that the integrity of the bargaining process was tainted by illegality, fraud, duress, unconscionabilily, or any other invalidating cause. The lease was not a contract of adhesion... Nothing suggests that the bargaining powers of the parties were unequal. Indeed, the evidence showed that [the plaintiff] was represented by counsel throughout the negotiation process and its acceptance of the lease was conditioned upon an inspection by an [expert] that was in fact conducted. Based upon the evidence presented and the public policy of this Commonwealth, there is no reasonable basis for ignoring the plain language of the merger clause, in which [the plaintiff] agreed that it was entering the contract free from influence by or in reliance upon any representations other than those set out in the contract.
This case is one that falls outside of the holding in Bates and within the modification thereof in Sound Techniques.
“[A] contractual provision flatly contradictory to a prior oral assurance should cause most people — and particularly, experienced knowledgeable business people — to pause.” Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 411 (1991), quoting from Turner v. Johnson & Johnson, 809 F.2d 90, 96 (1st Cir. 1989). The integration language accepted by Marram in the Subscription Documents must be read as the full and final expression of the parties’ agreement. “ [Agreements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so.” Freedman v. Walsh, 331 Mass. 401, 406 (1954). No special circumstances have been demonstrated here.
To prevail on a claim under G.L.c. 110A, Sec. 410, Marram must demonstrate that the sale of the Fund’s securities was effected through “material” misstatements or omissions. See, e.g., In re Choinski, 241 B.R. 515 (1997), aff'd., 187 F.3d 621.
Further,
the “total mix” of information is not altered by such [oral] misrepresentations and omissions because, as a matter of law, they are not considered part of the total mix . . . [W]here written, accurate and truthful information is provided to the buyer, information that contradicts oral misstatements and *500 cures alleged omissions, Congress’ objective has been met. To hold otherwise would extend the accountability of sellers far beyond that which is fair and which the language of the statute intends.
Wamser v. Less, 838 F.Sup. 393, 399 (E.D.Wis. 1993).
The Plan’s acknowledgment that the Subscription Agreement constitutes the entire understanding of the parties concerning the investments supersedes any prior oral understandings. It also makes any such oral statements not “material,” whether in the context of G.L.c. 110A, in the context of common-law negligent misrepresentation or with regard to the G.L.c. 93A claim presented here.
There can be no claim of justifiable reliance on Kobrick’s pre-investment oral comments in the face of the subsequent written — and unchallenged — disclosures in the Offering Memorandum and the Subscription Documents.
What is left is the issue of whether any of Kobrick’s post-investment comments or communications with Marram are actionable. In this regard, the communications seem hardly factual in nature, being more in the nature of the kind of predictions or opinions about the state and future of the market common to those who tout their services and expertise as investment advisors. See, e.g., Shaw v. Digital Equipment Corp., 83 F.3d 1194, 1217-18 (1st Cir. 1996); Powell v. Rasmussen, 355 Mass. 117, 118 (1969). In any event, it was not until December 11, 2000 that Marram took any step consistent with the redemption requirements of the Offering Memorandum. Those requirements, quoted above, are:
Generally, Shares may be redeemed by a shareholder on the last business day of each fiscal quarter occurring on or after the end of the twelve month period following the initial acquisition of the Shares by such shareholder on 30 days prior written notice to the Fund (subject to the sole discretion of the Board of Directors to waive such notice), or at such other times, and upon such other terms of payment, as may be approved by the Board of Directors, in its sole discretion.
Also, in the Subscription Documents, there is the following acknowledgment:
The [Plan] understands that it may not redeem Shares within the initial twelve months after it purchases such Shares and that, at the end of the twelve month period, it will generally have the right to redeem all or part of its Shares on the last business day of each quarter upon 30 days prior written notice.
The investments were made first on January 1, 2000, and then on March 1, 2000. The complaint recites that the Plan, “[o]n April 3, 2001,... requested that its holdings in the Offshore Fund be liquidated.” March 31, 2001, was the last day of the quarter following the end of the first anniversaiy of the Plan’s initial investment. It could not do so any earlier as a matter of right. Consequently, there can be no cognizable claim for damages. But damages are an essential element of the misrepresentation and c. 93A claims presented here. See, e.g., Golber v. BayBank Valley Trust 46 Mass.App.Ct., 256, 257 (1999); Fox v. F&J Gattozzi Corporation, 41 Mass.App.Ct. 581, 587 (1996); G.L.c. 93A Sec. 11 (claim only available to a person “who suffers any loss of money or property”).

ORDER

For the foregoing reasons, the defendants’ motion to dismiss is ALLOWED, and judgment is to enter without costs to either party.

For purposes of the present motion, Kobrick assumes, but does not concede, that Massachusetts law applies, but only for purposes of this motion.

As may be appropriate, other portions of the Subscriptions Documents and the Confidential Memorandum itself may also be quoted in the Discussion section of this Memorandum.