## George Lambert *vs.* Fleet National Bank.

Suffolk. January 3, 2007. - May 11, 2007.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Cordy, JJ.

*Practice, Civil,* Summary judgment. *Contract,* What constitutes, Performance and breach. *Consumer Protection Act,* Businessman's claim.

In a suit brought by a plaintiff borrower, claiming that the defendant bank had breached an oral agreement to renew a mortgage regardless of the plaintiff's default or late payment history, the trial judge did not err in granting summary judgment on the contract claim in favor of the defendant, where the statements that the plaintiff sought to interpret as an enforceable agreement were too vague and informal in substance to create any binding legal obligations [123-126]; further, the plaintiff's claim under G. L. c. 93A was untimely, where it was brought considerably more than four years after the defendant refused to renew the loan and foreclosed on the property in question [126].

Civil action commenced in the Superior Court Department on April 18, 2000.

The case was heard by *Patrick F. Brady,* J., on motions for summary judgment.

After review by the Appeals Court, 65 Mass. App. Ct. 1121 (2006), the Supreme Judicial Court granted leave to obtain further appellate review.

*A. Douglas Matthews* for the plaintiff.

*Donn A. Randall* (*J. Michael Scully* with him) for the defendant.

Cowin, J. The plaintiff, George Lambert, obtained a five-year, $500,000 commercial mortgage loan from a predecessor of the defendant, Fleet National Bank (now Bank of America).[1] The bank agreed to renegotiate the mortgage loan every five years so long as, among other things, the loan was not in default. Five

---

[1]As nothing turns on the relationship between the defendant's various predecessor banks, we refer to them collectively as "the defendant" or "the bank."

years later, as contemplated, the bank "rolled over" the mortgage loan into a new five-year note and mortgage. During the next several years, the plaintiff fell behind in the mortgage payments, as well as on taxes and bills on the property. As a result, the defendant declined the plaintiff's requests to roll over the mortgage once again, and ultimately foreclosed on and bought the property. The plaintiff brought suit for breach of contract and violations of G. L. c. 93A, claiming that the defendant had breached an agreement to renew the mortgage, and had misled the plaintiff into believing that it would do so.[2] A judge in the Superior Court granted summary judgment for the defendant. The Appeals Court affirmed. *Lambert* v. *Fleet Boston Corp.*, 65 Mass. App. Ct. 1121 (2006). We granted the plaintiff's application for further appellate review, and we affirm the judgment of the Superior Court.

*Background.* In reviewing a summary judgment decision, we view the material presented in the light most favorable to the nonmoving party, here the plaintiff. *Kelley* v. *Rossi*, 395 Mass. 659, 661 (1985). Viewed in this manner, the evidence in the record is as follows.

a. *The 1985 mortgage loan.* In 1985, the plaintiff purchased a thirty-two unit rental housing complex in Fall River for $1,000,000. Of the total purchase price, $500,000 was financed by a first mortgage provided by the defendant, with the balance furnished by a second mortgage from the sellers. At the closing, at the plaintiff's request, a bank officer provided a signed letter agreement stating that the bank would renegotiate the mortgage in five years, and in five-year increments thereafter, provided that the loan was not then in default, there was no history of delinquent payments, and the mortgaged property continued to be acceptable collateral.[3]

b. *The 1990 mortgage loan.* In the years that followed, the

---

[2]The plaintiff also claimed breach of the implied covenant of good faith and fair dealing, a claim which he does not press before this court. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

[3]The letter agreement stated: "The purpose of this letter is to advise you that the above referenced promissory note and mortgage executed by you on this date and which note expires on June 24, 1990, will be renegotiated by us with you at that time and every five years thereafter at the then prevailing

plaintiff experienced cash flow problems; he requested, and the bank provided, a third and a fourth mortgage on the property for $50,000 and $30,000, respectively. In 1990, when the 1985 mortgage note became due, the bank "rolled over" the outstanding balance, as well as the third and fourth mortgages, into a new five-year note for $425,000.

c. *The 1991 meeting.* In 1991, the plaintiff discovered that his property manager, Robert Levrault, had improperly negotiated approximately $28,000 in checks made out to the plaintiff and taken the funds for his own use. The plaintiff met with a bank loan officer, Donald Isles, and informed him of this situation.[4] The plaintiff stated that he had been advised to make a demand on the bank for reimbursement of the improperly withdrawn funds, but that he would prefer to recover the money from Levrault himself. The plaintiff indicated that he would "like the bank's cooperation" in seeking legal remedies against Levrault, and that he was short of funds, "so that if [he] went after Mr. Levrault and made no demands of the bank, [he] would expect some cooperation from [the bank] as far as late charges or if [he] slipped behind in the mortgage or other obligations such as the taxes or the water bills." The plaintiff said that he "was expecting a new first mortgage in 1995 and if there were any arrearages, the bank could then roll them into the first mortgage again as they had done previously, or preferably lend me a little more money." The plaintiff asked Isles if, due to his "cash crunch," it would be possible to roll over the mortgage any sooner than 1995.

According to the plaintiff, Isles said "that was perfectly agreeable with the bank," that "[h]e was very glad that I was going to go after the guilty party rather than deep pockets, and

---

rates and terms until the note is fully amortized but subject to the following conditions:

"a. The loan is not then in default; and

"b. The loan does not have a prior history of delinquency; and

"c. The mortgaged premises continues to meet the Bank's minimum criteria for mortgage loans based on appraised value and income producing capabilities."

[4]The plaintiff was accompanied by one of his associates, Paul Rodrigues, whose deposition testimony substantially corroborates the plaintiff's recollections of the meeting.

he was going to do everything [he] could to cooperate with me."
He told the plaintiff, "I'll see to it you don't pay any late
charges." Although cautioning the plaintiff that the bank was not
"in a position to lend any money," Isles noted that the bank
would renew the loan when it "was in a financial position to do
so." The plaintiff claims that Isles stated that he would "put a
memo" regarding this meeting in the plaintiff's file; however,
there is no record of any such memorandum.[5]

From time to time after this meeting, the plaintiff would inquire
of Isles whether the bank could roll over his note prior to its
expiration, but "the bank never got into that position apparently."
Isles did waive late fees on the plaintiff's mortgage payments on
several occasions.

d. *The 1995 negotiations.* In the early 1990's, the plaintiff
was unable to pay real estate taxes or water and sewer bills on
the mortgaged property, which constituted a default on the
mortgage loan. In 1994, the plaintiff met with an officer of the
bank to discuss refinancing his mortgage. At this meeting, the
bank officer expressed optimism that the bank would renew the
plaintiff's mortgage loan, and urged him to cease contact with
rival lenders. A similar meeting took place in April, 1995, with
a different bank officer. The parties anticipated that any deci-
sion by the bank to renew the loan would be expressed in a
formal commitment letter. Thereafter, however, the bank noti-
fied the plaintiff that it was declining to renew the loan.[6] The
bank foreclosed on the property; an order authorizing the
foreclosure entered in January, 1996, and the bank bought the
property at the foreclosure sale on or about April 25, 1996.

*Discussion.* Summary judgment is appropriate where there is
no genuine issue as to any material fact and the moving party is

---

[5]Although the plaintiff claims to have seen the memorandum briefly during
a later conversation with a bank officer, throughout the litigation the plaintiff
has referred to the 1991 conversation as creating an "oral agreement."

[6]In his deposition testimony, the plaintiff states that he was informed of the
bank's decision not to renew the loan in March, 1995. This conflicts with his
testimony that the bank still contemplated renewing the loan as of April, 1995.
Because correspondence regarding the bank's refusal to renew the loan is
dated as of late June, 1995, we assume that the plaintiff learned of the deci-
sion sometime between April and June of 1995. Nothing turns on this
discrepancy in dates.

entitled to a judgment as a matter of law. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). See *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). "[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

a. *Breach of contract claim.* The plaintiff's breach of contract claim is based on his 1991 meeting with Isles. He claims that their conversation constituted a binding oral agreement under which the bank, in consideration for the plaintiff's forbearance of any legal claim against the bank for funds misappropriated by Levrault, committed itself to renew the mortgage loan regardless of the plaintiff's default or late payment history. The plaintiff claims that this oral agreement constituted a new, independently binding obligation of the bank to renew the loan. Alternatively, the plaintiff argues that the agreement modified the bank's 1985 letter agreement regarding future renegotiations, essentially waiving two of the bank's conditions to renegotiation: that the loan not be in default, and that there be no history of delinquent payments.

At the outset, we note that to the extent the plaintiff attempts to enforce the 1985 letter agreement, there may be little, if anything, to enforce. The agreement did not obligate the bank to renew the loan, but only to "renegotiate" its terms, provided that certain conditions were met. In any event, we conclude that, however the 1991 meeting is viewed, it was too vague and informal in substance to create any binding legal obligations.

"It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 878 (2000). While it is not necessary that every term of the agreement be specified with precision, "[t]he parties must . . . have progressed beyond the stage of 'imperfect negotiation.' " *Id.*, quoting *Lafayette Place Assocs.* v. *Boston Redevelopment Auth.*, 427 Mass. 509, 517-518 & n.9

(1998), cert. denied, 525 U.S. 1177 (1999). See *Vitale* v. *Russell*, 332 Mass. 523, 525 (1955), quoting *Brighton Packing Co.* v. *Butchers' Slaughtering & Melting Ass'n*, 211 Mass. 398, 405 (1912) ("Expectations and negotiations fall far short of a binding agreement"). Here, the statements in the 1991 conversation that the plaintiff interprets as a binding agreement are precisely the type of "expectations and negotiations" that do not manifest an intent to be bound.

In the course of the 1991 discussion, the plaintiff indicated that he would not seek reimbursement for any misappropriated funds from the bank, but "*would expect some cooperation* from [the bank] as far as late charges or if [he] slipped behind in the mortgage" (emphasis added). The plaintiff stated that he "*was expecting* a new first mortgage in 1995" (emphasis added), and made at least two different proposals to the bank: that they roll any arrearages that might arise into a new first mortgage or, alternatively, lend the plaintiff more money to cover his shortfalls. Although Isles supposedly responded that "that was perfectly agreeable with the bank," from the plaintiff's account of the conversation, it is impossible to determine what aspect of the plaintiff's vague and general set of proposals Isles found "perfectly agreeable." Similarly, the plaintiff claims that Isles said "he was going to do everything [he] could to cooperate with me,"[7] yet conspicuously absent was any discussion of specifically what "cooperation" the bank was required to give regarding the loan — in other words, how much of a default on the loan the bank was required to overlook in exchange for forbearance of the plaintiff's legal claim. At most, Isles expressed a general expectation that the bank would renew the loan when it "was in a financial position to do so," and agreed to waive late charges. In short, the plaintiff describes the kind of vague and general discussion that is common in the preliminary stages of business dealings and does not rise to the level of an enforceable agreement.

---

[7] It is not clear from the plaintiff's deposition testimony whether this offer to "do everything [he] could to cooperate" with the plaintiff referred only to "cooperation" in pursuing legal remedies against Levrault, or also extended to financial "cooperation." We view the testimony in the light most favorable to the plaintiff, as we must, and assume that some financial "cooperation" with the plaintiff was contemplated.

The plaintiff's reliance on *Silver* v. *Graves*, 210 Mass. 26 (1911), is misplaced. There, the defendant promised that, if the plaintiffs withdrew their appeal in a will contest, he would "make it right with [them] with a certain sum" and "give [them] a sum of money that would be satisfactory." *Id.* at 28. The plaintiffs subsequently withdrew the appeal, and the defendant's promise to pay was held enforceable. *Id.* at 29. In so holding, the court stressed that a valid, binding contract existed between the parties and "[t]he only element left undetermined in this contract [was] that of price." *Id.* This case thus stands for the unremarkable proposition that where a binding agreement has been established, it will not necessarily fail because of the indefiniteness of one or more terms, especially where one party has already performed. See *Cygan* v. *Megathlin*, 326 Mass. 732, 734-735 (1951), and cases cited. In such cases, the question is not, as it is here, whether a contract existed at all, but whether an admittedly binding contract was nonetheless "too indefinite to be enforced."[8] *Id.* at 736. See generally 1 S. Williston, Contracts § 4:18 (4th ed. 1990). In the present case, by contrast, not only does the extreme vagueness of the purported "agreement" make its enforcement impossible, see, e.g., *Held* v. *Zamparelli*, 13 Mass. App. Ct. 957, 958 (1982), it indicates that there was no intent to be bound, and thus no agreement, in the first place. See Restatement (Second) of Contracts § 33 comment c (1981) ("The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement").

The plaintiff argues that it would make no sense for him to give up his right to proceed against the bank for the wrongfully negotiated checks without exacting a substantial consideration in return. Setting aside whether Isles had the authority to settle a sizable legal claim on the bank's behalf, it is inconceivable that such a major modification to a large commercial loan would be made informally and in general terms rather than in a finely

---

[8]Indeed, the cases on which the plaintiff relies all proceed on the assumption that an enforceable agreement existed. See *Delorafano* v. *Delorafano*, 333 Mass. 684, 686-687 (1956); *Fenton* v. *Federal St. Bldg. Trust*, 310 Mass. 609, 612-614 (1942); *Coz Chem. Corp.* v. *Riley*, 9 Mass. App. Ct. 564, 566-568 (1980).

detailed written agreement.[9] See *Coolidge Bank & Trust Co.* v. *First Ipswich Co.*, 9 Mass. App. Ct. 369, 371 (1980), quoting *Springfield Y Trust* v. *Executive Director of the Mass. Hous. Fin. Agency*, 369 Mass. 709, 714 (1976) (commercial loan documents are generally detailed and "drawn with manifest care"). "Particularly in the case of a sizable commercial loan, it is unlikely that oral understandings which leave essential terms to future negotiation will support an enforceable loan agreement." *Coolidge Bank & Trust Co.* v. *First Ipswich Co., supra.* See *Pappas Indus. Parks, Inc.* v. *Psarros*, 24 Mass. App. Ct. 596, 599 (1987). Indeed, the fact that one would ordinarily expect a particular transaction to be set forth in a carefully written document "justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled." *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 630 (1979).

b. *G. L. c. 93A claim.* A four-year statute of limitations applies to G. L. c. 93A claims. See G. L. c. 260, § 5A. Under the "discovery rule," this limitations period is subject to tolling until the plaintiff knew or should have known of the alleged injury. See *Albrecht* v. *Clifford*, 436 Mass. 706, 714-715 (2002). See also *Schwartz* v. *Travelers Indem. Co.*, 50 Mass. App. Ct. 672, 678 (2001). The plaintiff bases his G. L. c. 93A claim on his 1995 conversations with bank officers regarding renewal of the loan, during which the plaintiff claims the bank was "stringing [him] along" and caused him to forgo other opportunities for refinancing before abruptly refusing to renew the loan and foreclosing on his property. The plaintiff knew or should have known of this claim when it became clear that the bank would not renew the loan. Because the undisputed facts disclose that the action was filed on April 18, 2000, considerably more than four years after the bank refused to renew the loan and foreclosed on the property, the plaintiff's claim is untimely.[10]

The plaintiff's claim also fails on its merits. To prevail on a

[9]It also seems unlikely that the bank, in exchange for the forbearance of a claim totaling at most $28,000, would obligate itself to loan the plaintiff many times that amount.

[10]There is no merit to the plaintiff's argument that the foreclosure sale in April, 1996, was a "new harm" or continuing violation that somehow restarted the statute of limitations. To the contrary, the foreclosure sale at most increased

claim under G. L. c. 93A, the plaintiff must demonstrate an unfair or deceptive act or practice by the bank, i.e., one that falls "within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *Wasserman* v. *Agnastopoulos*, 22 Mass. App. Ct. 672, 679 (1986), quoting *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). While "stringing along" that induces detrimental reliance can, in some cases, constitute a G. L. c. 93A violation, see *Greenstein* v. *Flatley*, 19 Mass. App. Ct. 351, 356 (1985), "[i]t is not . . . immoral, unethical, oppressive, or unscrupulous — and therefore not unfair or deceptive — to break off incomplete and imperfect negotiations of a commercial agreement." *Pappas Indus. Parks, Inc.* v. *Psarros*, 24 Mass. App. Ct. 596, 600 (1987). Here, any statements by the bank that it would renew the plaintiff's loan were made in the context of preliminary negotiations, which the parties expected to be finalized in a commitment letter. Despite his purported lack of sophistication in his dealings with banks, the plaintiff was a businessman engaging in a major commercial transaction. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 475-476 (1991) (one engaged in business dealings may need to show greater "rascality" to prevail on G. L. c. 93A claim than "less sophisticated party"). Every business person should anticipate that a party to a transaction may change its mind before the deal is concluded. See *Pappas Indus. Parks, Inc.* v. *Psarros, supra* ("Every deal that goes sour does not give rise to a c. 93A claim").

*Conclusion.* The motion judge concluded correctly that the plaintiff had no "reasonable expectation" of proving any of his claims. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). The order granting summary judgment in favor of the defendant is affirmed.

*So ordered.*

---

the *extent* of the plaintiff's injuries, and "[i]f knowledge of the extent of injury were to control the accrual of a cause of action, the fixed time period of statutes of limitations effectively would be destroyed." *Hanson Hous. Auth.* v. *Dryvit Sys., Inc.*, 29 Mass. App. Ct. 440, 446 (1990), quoting *Olsen* v. *Bell Tel. Labs., Inc.*, 388 Mass. 171, 175 (1983).