Hinkle, Margaret R., J.
This case involves claims by the Geo-Centers, Inc. Profit Sharing Plan & Trust (the “Plan”) against the Kobrick Offshore Fund, Ltd. (the “Offshore Fund” or the “Fund”), Kobrick Capital Management, LLC, and Frederick Kobrick (“Kobrick”), involving the Plan’s $2 million investment in the Fund.
*453 In its amended complaint, the Plan asserted claims under the Uniform Securities Act, M.G.L.c. 110A, §410(a) (2), for misrepresentation. It also alleged negligent misrepresentation and breach of Chapter 93A, §11.[1] Before trial, the Plan dismissed its negligent misrepresentation claim. The Uniform Securities Act claim was tried before a jury from November 16 to November 30,2009, who found that Kobrick made no misrepresentation to the Plan before its investments. After that verdict, I conducted a two-day bench trial on the Chapter 93A claim, which includes claims of both pre-investment and post-investment impropriely.
FINDINGS OF FACT
Based on the credible evidence and inferences reasonably drawn therefrom, I make the following findings.
The Claim of Pre-Investment Misrepresentation
The Plan is a pension plan created for employees of Geo-Centers, Inc., a high technology company. By late 1999, Edward Marram had been Chairman and CEO of Geo-Centers for more than 25 years and owned approximately 70 percent of the company. He was the Plan’s sole Trustee and its largest single beneficiary. For almost 20 years, Marram had controlled and directed its investments. He holds a Ph.D., completed an executive program at Harvard Business School, and for approximately nine years was Entrepreneur-in-Residence at Babson College.
The Plan’s investments in the Fund included a January 1, 2000 investment of $1.5 million and a March 1, 2000, investment of $500,000.[2] Soon after the second investment, the stock market decline began to affect the Fund, so by the end of August 2000, the Plan’s $1.5 million investment had declined by 36.7%, and its $500,000 investment had fallen by nearly 48 percent. As a result, Marram was understandably concerned about the Plan’s investment.
On October 19, 2000, Marram met with Kobrick, who expressed confidence in the future outlook for the Fund. Marram says Kobrick told him at this meeting that no investors had left the Fund, that new money was coming in, and that the Fund was diversified. Marram decided to leave the Plan’s monies invested.
The Fund continued to decline in value. By November 30, 2008, the Plan’s original investment had shrunk to $751,910. On December 11, 2000, Marram directed the Fund to liquidate the Plan’s account. Kobrick asked Marram to reconsider until they met on December 27, 2000. At that meeting, Kobrick told Marram that he believed that the Fund would improve, and Marram elected to rescind his order to liquidate. As of December 31, 2000, the Plan’s investment in the Fund had a value of $723,825. The Fund continued to decline in value. On April 3, 2001, Marram directed that the Plan’s holdings in the Fund be liquidated. The Plan’s investment was ultimately liquidated on May 7, 2001, with $526,311 wired to the Plan.
As noted, Marram was an experienced and knowledgeable investor. Among other things, before the Plan’s investments in the Fund, Marram had invested Plan assets in two hedge funds,[3] and had co-founded and/or was a managing member of four venture capital funds that invested in start-up companies, including technology companies.
At the time of Marram’s initial contact with Kobrick, he had managed mutual funds and hedge funds for 30 years, including aggressive growth mutual funds at Wellington Capital and State Street Research. In 1997, Kobrick left State Street Research and formed Kobrick Capital Management, which managed two domestic hedge funds as well as the fund at issue here, the Offshore Fund, a Cayman Islands hedge fund focused on achieving significant returns through high-risk techniques.
During the summer of 1998, a Harvard Business School professor who was a mutual friend of Marram and Kobrick asked Kobrick to speak to Marram about his interest in investing with Kobrick. Later that summer, Marram called Kobrick to inquire about his investment record, and Kobrick described his funds and his investment record. Although the Plan was not then ready to invest, Marram requested additional information. During the next 16 months, Marram received articles from Kobrick that described his aggressive investing style and the volatility of his funds.
During 1999, the value of technology stocks increased rapidly, and the returns generated by the Nasdaq index outpaced other market indices. Thus, during the second half of 1999, Marram and Brian Laveiy decided to increase the Plan’s holdings in growth stocks.[4] In early December, Marram called Kobrick to arrange a meeting, which occurred December 17, 1999 and included Lavery. The Plan claims that during this meeting Kobrick misrepresented: (i) that the Fund was a suitable investment for the Plan; (ii) that the Fund was diversified and invested in a variety of industries; (iii) that the stock of high technology companies did not constitute a majority of the Fund’s holdings; and (iv) that the Fund would not be a volatile investment.
To the extent Marram offered testimony that Kobrick made these statements, his testimony lacked credibility. For example, he testified that he did not know, and Kobrick did not inform him, that the Fund was a hedge fund. That testimony is discredited by Marram’s contemporaneous notes from the meeting referring to “hedge fund,” and Lavery’s acknowledgment that Kobrick told the two of them that the Offshore Fund was a hedge fund.
Marram’s testimony that he was uninterested in a fund with high returns and that he did not know that the Fund was a growth fund generating high returns also lacks credibility.[5] Among other things, Lavery’s contemporaneous notes reflect that Kobrick said dur *454 ing their meeting that the Fund had 176% returns year to date.
I credit Kobrick’s testimony that he never stated that the Fund was “suitable” for the Plan, and no credible evidence supports the assertion that Kobrick represented that high technology stocks did not constitute a majority of the Fund’s holdings. Marram conceded he never asked Kobrick what percentage of the Fund’s investments were in technology and that Kobrick never told him. Laveiy’s contemporaneous notes also reflect that Kobrick told Marram “when tech is the right place to be, I’m in techs.”
Marram’s assertion that Kobrick represented that the Fund would not be a volatile investment also lacks credibility. First, Marram testified that the term “volatility” never came up at the December 17 meeting. Second, after that meeting Kobrick arranged for the Plan to receive the Fund’s Confidential Private Placement Memorandum, which disclosed, among other things, that the Fund:
was “SPECULATIVE” and entailed “substantial risks”;
involved a “HIGH DEGREE OF RISK”;
was designed to achieve “above market growth”;
could use leverage in amounts determined in Kobrick’s sole discretion, and the use of leverage increased the risk of loss as well as the potential return on investments;
invested in volatile markets as well as small and mid-cap companies whose stock prices were “often more volatile than the prices of large-capitalization stocks”;
could engage in risky investment techniques, such as short selling, purchasing options, using derivative instruments; and
lacked diversification guidelines and would “invest a significant portion” of its assets in “higher growth industries, such as technology (and) telecommunications.”
Third, after that meeting Kobrick also arranged for the Plan to receive the Fund’s subscription documents. On January 1, 2000, Marram signed the Subscription Agreement, in which he represented, among other things, that:
he had “received and read a copy of the Memorandum outlining, among other things, the organization and investment objectives and policies of, and the risks ... of an investment in the Fund”;
his investment in Kobrick’s hedge fund was “consistent with the investment purposes and objective” of the Plan “and will not adversely affect [the Plan’s] overall need for diversification and liquidity”;
he had “such knowledge and experience in financial and business matters that [he] is capable of evaluating the merits and risks of [the Plan’s] investment” in Kobrick’s hedge fund;
he had “evaluated the risks of investing in [Kobrick’s hedge fund] and determined that the [Fund is] a suitable investment for the [Plan]”;
he “understood, agreed and was aware that there were substantial risks of loss of investment incidental to the [investment in the Kobrick hedge fund], including those summarized in the [Offering Memorandum].”
In sum, the Plan failed to sustain its burden of showing that Kobrick breached Chapter 93A in any way in his pre-investment conduct with the Plan.
The Claim of Post-Investment Misrepresentation
In its amended complaint, the Plan also alleges that Kobrick breached Chapter 93A, §11 by “making positive statements about the Offshore Fund’s performance and prospects in order to induce the Plan to maintain its investment in the Offshore Fund when, in fact, the defendants knew, or should have known, that the Offshore Fund would continue to lose money.” In addition, the Plan claims that Kobrick promised “to provide the Plan with certain information about the Fund’s securities holdings (by company and sector) so as to further induce the plan to maintain its investment ... all the while not intending to provide such information.” The Plan also claims that Kobrick: (i) said “new” money was coming into the Fund; (ii) that the “new” money was primarily from other ERISA investors; and (iii) stated “on April 14, 2000 that in March the Offshore Fund had sold most of its technology holding and shorted quite a bit more.”
I turn initially to the Plan’s claim that Kobrick “promised” to provide a list of securities held by the Fund. No credible evidence suggests that such a “promise” was ever made. I do not credit Marram’s testimony that during a December 27, 2000 conference call, Kobrick “promised” to provide the Plan with a list of the Fund’s individual securities. Rather, I credit Kobrick’s testimony that he merely told Marram during that call that he would discuss Marram’s request for a list of securities with his Chief Operations Officer and his Chief Financial Officer. Kobrick did so, then called Marram to tell him that the Fund would not provide a list of its individual holdings, but Marram did not return that call. Moreover, the Plan’s conduct after that conference call is inconsistent with any belief on Marram’s part that Kobrick “promised” to provide a list of the Fund’s securities. On January 10, 2001, the Chief Operations Officer of Kobrick Capital Management, Richard Goldman, sent Laveiy information about the Fund that the Plan had requested during the conference call. This information did not contain a list of the Fund’s securities. In his accompanying memorandum, Goldman stated: “Please call me to let me know if this is sufficient.” The Plan did not subsequently request the list of securities from Goldman or Kobrick. Rather, the next communication from the Plan to Kobrick was a February 20, *455 2001 letter, stating in relevant part: “As a result of our telephone conference on December 27, 2000, we had discussed our desire to receive a listing of the assets held in our account so that we could make a prudent assessment of whether we should continue with this investment.” The fact that this letter uses the word “desire” rather than “promise” is further evidence that Marram did not believe Kobrick had “promised” to provide a list of securities.
The Plan offered no credible evidence that any statement made by Kobrick had any material impact on the Plan’s decision to remain invested in the Fund. Rather, I conclude that the Plan remained invested in the Fund through April 2001 because of its hope that the stock market would rebound. On May 23, 2000, Marram and Laveiy completed an investor questionnaire on behalf of the Plan that stated:
It was “willing to subject a portion of [its] principal to increased risk to generate a greater rate of return”; it could “tolerate moderate losses (10% or more in one year) to achieve potentially favorable returns”; If the stock market suddenly lost 25% of its value in one month, it would ”[h]old . . . understanding] [its] investment [might] be subject to price swings and [is] comfortable risking additional losses,” and risk, as defined by the Plan, meant “not achieving [its] investment return goals.”
This questionnaire demonstrates the Plan’s objective to ride out the stock market and the Fund’s decline in order to obtain future returns. As a sophisticated investor. Marram knew that no one could predict the performance of an investment, and that an investment in an aggressive growth fund involved risks.
Despite the Fund’s overall poor performance after the market collapse in mid-March 2000, the Fund produced positive returns in August (+/-11.8%) and September of 2000 (+/-1.85%). In fact, in August the Fund was the Plan’s best performing investment, and in September its second best. In October 2000, Lavery recommended that the Plan maintain its investment in the Fund while acknowledging that the Fund was “speculative” with “significant risks.” Therefore, I conclude that the Plan, knowing the potential risks of investing in a hedge fund, decided to remain invested until April 3, 2001 not because of any representation, promise or the like by Kobrick, but because, as both Marram and Laveiy conceded, they wished to see if the Fund could rebound and return to its positive returns of Februaiy, August and September of 2000.
I turn now to the Plan’s other assertions of post-investment misrepresentation by Kobrick. After the Plan’s initial investment, Kobrick sent performance reports to the Plan commenting on the Fund’s performance. He also sent periodic letters opining on the stock market’s performance, current economic conditions, and the like. Some of those letters contained optimistic handwritten notations from Kobrick such as: “this shall be a good year!” I credit Kobrick’s testimony that his opinions about the stock market’s performance and his view of current economic conditions in the letters were made in good faith based on his 30 years investment experience. The letters introduced into evidence do not display any intent on Kobrick’s past to deceive the Plan or induce it to remain invested.
The Plan contends that Kobrick’s April 14, 2000 letter made the following misrepresentation: “In late March, we sold most of our technology holdings and shorted quite a bit more.” The credible evidence, however, shows that Kobrick’s statement was accurate. At the end of February 2000, the Fund’s portfolio was invested 111.7% in high technology. By the end of March, the Portfolio Report reflects that the Fund was -29% invested in high technology. Thus, the Fund was negatively invested in high technology stocks because Kobrick’s short positions in technology exceeded his long positions.
As noted. Marram also claimed that Kobrick represented at an October 19, 2000 meeting that no investor had left the Fund and that new money was still coming into the Fund. I credit Kobrick’s testimony that he never said “new” funds were coming into the Fund as of that date because both Marram and Laveiy conceded on cross-examination that Kobrick mentioned no specific time frame for when money came into the Fund.
Finally, contrary to plaintiffs position, between March and October 19, 2000, no investor “left” the Fund. One investor sold a small portion of his investment, representing approximately 1/3 of 1% of the Fund’s total assets. During 2000, $24.5 million in new investment came into the Fund. Of that amount, close to $20 million was invested after the beginning of the market collapse in March 2000.
CONCLUSIONS OF LAW
The principles underlying recoveiy under G.L.ch. 93A, § 11 are well established. To succeed on its claim, the Plan must prove that it ”suffer[ed]” a “loss of money or property, real or personal, as a result of the use or employment by [Kobrick] of an unfair method of competition or an unfair or deceptive act or practice . . .” An “unfair or deceptive act or practice” is “one that falls ‘within at least the penumbra of some common-law, statutory, or other established concept of unfairness.’ ” Lambert v. Fleet Nat’l. Bank., 449 Mass. 119, 127 (2007), quoting Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 679 (1986). To be deemed deceptive, a representation, omission or practice must be “likely to mislead [persons] acting reasonably under the circumstances,” and must be “material” Aspinall v. Philip Morris Cos., 442 Mass. 381, 395 (2004), quoting Matter of Cliffdale Assocs., 103 F.T.C. 110, 165 (1984) (emphasis added). ‘To constitute a misrepresentation, an assertion must be one of fact, not of expectation, estimate, opinion, or judgment.” Forbes v. Janisch, 2009 WL 701109 at *1 (Mass.App.Ct. *456 2009). Vague and general statements are generally not actionable. See Masingill v. EMC Corp., 449 Mass. 532, 544 (2007). The standard of unfairness in Section 11 cases is higher than the standard employed where actions are brought under §9. Madan v. Royal Indem. Co., 26 Mass.App.Ct. 756, 763 n.7 (1989). In assessing whether a party breached Section 11 by engaging in an unfair or deceptive act or practice, the Court may consider, among other things, the sophistication of the parties. Lambert, 449 Mass. at 127 (quoting Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 475-76 (1991)).
As noted, the juiy found that Kobrick made no pre-investment misrepresentation to the Plan. Like the juiy, I draw the same conclusion. As to the post-investment claim, the Fund’s Offering Memorandum explained its speculative nature, its focus on aggressive growth, its risks and its volatility. Marram was an extremely sophisticated investor who read and understood the Offering Memorandum. The inescapable conclusion, as stated above, is that the Plan remained invested in the Fund not because of Kobrick’s promises or assurances, but because it hoped that the downturn in the stock market would resolve itself and provide the Plan with future positive returns. I therefore conclude that none of Kobrick’s alleged post-investment misrepresentations constitute a violation of G.L.c. 93A, §11.
The M.G.L.c. 231, §6F Claim
Lastly, the defendants have moved under M.G.L.c. 231, §6F for reasonable attorneys fees and costs in defending against plaintiffs claims. That statute provides in relevant part:
Upon motion of any party in any civil action in which a finding, verdict, decision, award, order or judgment has been made by a judge ... or other finder of fact, the court may determine, after a hearing, as a separate and distinct finding, that all or substantially all of the claims . . . whether of a factual, legal or mixed nature, made by any party who was represented by counsel during most or all of the proceeding, were wholly insubstantial, frivolous and not advanced in good faith.
General Laws c. 231, §6 permits a court to assess reasonable legal costs and fees against a party when all or substantially all of its claims or defenses are wholly insubstantial, frivolous, and not advanced in good faith. See Lewis v. Emerson, 391 Mass. 517, 525-26 (1984) (section 6F focuses on the conduct of the litigation, not on previous conduct). Awards of legal fees under the statute “should be reserved for rare and egregious cases.” Police Commissioner of Boston v. Gows, 429 Mass. 14, 18 (1999).
A claim is frivolous if there is an “absence of legal or factual basis for the claim.” Demoulas Super Mkts., Inc. v. Ryan, 70 Mass.App.Ct. 259, 267 (2007). Good faith implies “an absence of malice, an absence of design to defraud or to seek an unconscionable advantage.” Han v. Planning Bd. of Stoughton, 403 Mass. 332, 337 (1988). The Court considers the claimant’s subjective belief in the validity of his claim and whether that belief is reasonable when evaluating if a claim was made in good faith. See Massachusetts Adventura Travel, Inc., 27 Mass.App.Ct. at 297, 299 (inquiry is neither wholly subjective nor wholly objective).
While I acknowledge that the Plan’s claims were weak, its conduct does not rise to a level warranting an award of attorneys fees and costs. In drawing that conclusion, I note that the SJC reversed Judge van Gestel’s dismissal of plaintiffs complaint, and both Judge van Gestel and Judge Gants later denied defendants’ summaiy judgment motions. Those rulings buttress my conclusion that plaintiffs claims did not lack any basis in the facts or the law. Although insufficient to prevail, plaintiffs claims were not wholly insubstantial, frivolous and not advanced in good faith. Therefore, I deny defendants’ c. 231, §6F motion.
ORDER FOR JUDGMENT
Based on the findings and rulings set forth herein, judgment shall enter as follows:
1. For the defendants on plaintiffs claim under c. 110A, §410.
2. For the defendants on plaintiffs Chapter 93A claim; and
3. For the plaintiff on defendants’ Motion for Fees under M.G.L.c. 231, §6F.

 On December 9, 2002, Judge van Gestel dismissed the initial complaint. Marram v. Kobrick Offshore Fund, Ltd, 15 Mass. L. Rptr. 496, 2002 WL 31957014. In 2004, the Supreme Judicial Court vacated the dismissal. Marram v. Kobrick Offshore Fund. Ltd., 442 Mass. 43 (2004). [Editor’s Note: For another opinion in this matter see 25 Mass. L. Rptr. 443 (Gants, Ralph D., J.) (holding, inter alia, that the ERISA preemption clause bars a counterclaim for contribution from the plaintiff/trustee; and a clause of the private offering agreement authorizing the recovery of fees by the seller violates public policy as applied to an action for misrepresentation).]

 As a result of the Plan’s investments, the Fund had approximately $30 million in assets. The Plan’s $2 million investment represented approximately 6.66% of the Fund’s assets at the time.

 By definition, a hedge fund is a “specialized investment group [usually] organized as a limited partnership or offshore investment company — that offers the possibility of high return through risky techniques such as selling short or buying derivatives.” Marram, 442 Mass. at 446 fn.5 (2004)

 Lavery had acted in the capacity of Plan administrator since 1991. He was an employee of Geo-Ceiiters; he maintained files for the Plan, provided daily assistance and helped interview potential investment managers.

 At trial there was no evidence that Kobrick made any representation about diversification, and Lavery testified to the contrary. Thus, I infer Marram knew at all relevant times that the Fund was not fully diversified.