Gants, Ralph D., J.
The allegations in these consolidated cases trace back to the stock market decline that welcomed the new millenium. As alleged in the Complaint in Civil Action 01-2815, in 1999, Edward Marram was the Chairman and Chief Executive Officer of Geo-Centers, Inc., and also served as the Trustee of the Geo-Centers, Inc. Profit Sharing Plan & Trust (“the Plan”), which was a profit sharing plan for Geo-Centers’ employees. On December 17, 1999, Marram met with Frederick Kobrick (“Kobrick”), a principal of Kobrick Capital Management, LLC, to discuss a possible investment in one of the funds that Kobrick managed. Kobrick told them that the Kobrick Offshore Fund (“the Fund”) would be a suitable investment for the Plan, that it was a diversified fund, that high technology investments did not constitute amajority of the Fund’s holdings, and that he managed the Fund so it would not be a volatile investment vehicle. After this meeting, Kobrick arranged *444 for Marram to receive the Fund’s Offering Memorandum and accompanying subscription documents. On Januaiy 1, 2000, the Plan invested $1.5 million in the Fund’s Series 2 stock, and invested another $500,000 in the Fund’s Series 4 stock on March 1, 2000.
The market decline, especially in the technology sector, began to hit the Fund hard in March 2000. By June 30, 2000 the Plan’s $2 million investment had declined bynearly35 percent in value. By the end of August 2000, the Series 2 investment had declined by 36.7 percent, and the Series 4 investment had fallen nearly 48 percent. Kobrick continued to express confidence that the outlook for the future was good, and that things were improving. On October 19, 2000, Marram met with Kobrick, who told him that no investors had left the Fund, that new money was coming in, and that the Fund was diversified. Marram decided to leave the Plan’s monies invested in the Fund. The Fund, however, continued to decline in value so that, by November 30, 2000, the Plan’s original $2 million investment was worth only $751,910. On December 11, 2000, Marram directed the Fund to liquidate the Plan’s account but Kobrick asked Marram to reconsider until they had a chance to meet, which they did on December 27,2000. At this meeting, Kobrick told Marram that he was very confident that the Fund would do better and promised to provide Marram with a list of companies held by the Fund, as well as an analysis of the investment sectors that caused the Fund’s losses. He also reassured Marram that the Fund was starting to perform better and that it was not invested in any “dot-com” companies. As a result of this conversation, Marram decided to rescind his liquidation order.
The Fund, though, continued to decline in value, and Kobrick never provided Marram with the information or analysis he had promised. On April 3, 2001, Marram again directed that the Plan’s holdings in the Fund be liquidated, which this time they were. The Plan lost $1,415 million, and commenced this action. Marram, on behalf of the Plan, alleged three claims: 1) false statements in violation of G.L.c. 110A, §410; (2) negligent misrepresentation; and 3) violation of G.L.c. 93A, §11. Various false statements were alleged to have been made by Kobrick and the Kobrick entities, some designed to cause Marram to invest Plan monies with the Fund and others designed to cause him to leave the money there rather than liquidate. The false statements allegedly made prior to the Plan’s investment were that:
the Fund was diversified and was invested in a variety of industries;
high technology stocks did not constitute a majority of its holdings;
the Fund was not a volatile investment vehicle; and
the Fund was a suitable investment for the Plan’s portfolio.
The false statements that allegedly were made to persuade Marram to postpone liquidation of the Plan’s account were:
Kobrick’s positive statements about the Fund’s performance and prospects; and
the promise, never kept, to provide Marram with information and analyses about the Fund’s holdings.
On December 9, 2002, Judge Allan van Gestel dismissed the Complaint. Marram v. Kobrick Offshore Fund, Ltd., 15 Mass. L. Rptr. 496, 2002 WL31957014 (Mass.Super. 2002). Judge van Gestel observed that Marram had received the Fund’s Offering Memorandum and had executed the Subscription Documents, in which the Investor was asked to make various representations, including that:
The offer and sale of shares ... in Kobrick Offshore Fund, Ltd. ... is being made on the basis of the Confidential Private Offering Memorandum of the Fund.
The [Plan] agrees to, and understands, the terms and conditions upon which the Shares are being offered, including, without limitation, the risk factors referred to in the Memorandum.
The [Plan] has received and read a copy of the [Offering] Memorandum.
The [Plan] hereby agrees that by its execution of this Subscription Agreement and upon acceptance hereof by the Fund, it shall become bound by the terms of the Fund Documents.
The [Plan] acknowledges that in making a decision to subscribe for Shares the [Plan] has relied solely upon the Memorandum, the other Fund Documents and independent investigations made by the [Plan].
The [Plan] has such knowledge and experience in financial and business matters that the [Plan] is capable of evaluating the merits and risks of the [Plan’s] investment in the Shares and is able to bear such risks, and has obtained, in the [Plan’s] judgment, sufficient information from the Fund or its authorized representatives to evaluate the merits and risks of such investment. The [Plan] has evaluated the risks of investing in the Shares and has determined that the Shares are a suitable investment for the [Plan]. The [Plan] has not utilized any other person as a purchaser representative in connection with evaluating such merits and risks.
This Subscription Agreement constitutes the entire arrangement and understanding between the parties hereto regarding its subject matter, and super-cedes any prior or contemporaneous agreements, arrangements and understandings, written or oral, between the parties regarding the same.
Id. With respect to the alleged misrepresentations made prior to the Plan’s investment in the Fund, Judge van Gestel held:
The Plan’s acknowledgment that the Subscription Agreement constitutes the entire understanding of the parties concerning the investments supersedes any prior oral understandings. It also makes any *445 such oral statements not “material,” whether in the context of G.L.c. 110A, in the context of common-law negligent misrepresentation or with regard to the G.L.c. 93A claim presented here.
There can be no claim of justifiable reliance on Kobrick’s pre-investment oral comments in the face of the subsequent written — and unchallenged — disclosures in the Offering Memorandum and the Subscription Documents.
Id. With respect to the alleged misrepresentations made after the initial investment, intended to prevent or delay the Plan’s liquidation of its holdings in the Fund, Judge van Gestel noted:
The Offering Memorandum, at pp. 5 and 32, twice contains, among other things, the following:
Generally, Shares may be redeemed by a shareholder on the last business day of each fiscal quarter occurring on or after the end of the twelve month period following the initial acquisition of the Shares by such shareholder on 30 days prior written notice to the Fund (subject to the sole discretion of the Board of Directors to waive such notice), or at such other times, and upon such other terms of payment, as may be approved by the Board of Directors, in its sole discretion.
Id. He then declared that the liquidation of the Plan’s investment, which occurred on April 3, 2001, was only two days later than the earliest date on which the Plan had the right to liquidate under the Offering Memorandum.
The investments were made first on January 1, 2000, and then on March 1,2000. The complaint recites that the Plan, “[o]n April 3, 2001, . . . requested that its holdings in the Offshore Fund be liquidated.” March 31, 2001 was the last day of the quarter following the end of the first anniversary of the Plan’s initial investment. It could not do so any earlier as a matter of right. Consequently, there can be no cognizable claim for damages. But damages are an essential element of the misrepresentation and c. 93A claims presented here.

Id.

The Supreme Judicial Court, however, vacated the dismissal and held that Judge van Gestel had erred in allowing the motion to dismiss. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43 (2004) (“Marram”).
This Court will not attempt here to summarize all of the Supreme Judicial Court’s reasons for vacating the dismissal. It suffices to say that the Supreme Judicial Court found that the allegations, if proved, were sufficient to support each of the three counts in the Complaint. The Court’s findings, however, as to the claim alleging violation of the Uniform Securities Act, G.L.c. 110A, §410(a) (2) (“the Act”), are important to understand in some detail, since they weigh heavily on the issues to be addressed in the motions presently before this Court. The Supreme Judicial Court observed that Marram may prove a violation of the Act by showing that Kobrick, in offering or selling a security in Massachusetts, (1) made an untrue statement or omitted to state a material fact, (2) that Marram did not know of the untruth or omission, and (3) that Kobrick knew or “in the exercise of reasonable care” would have known of the untruth or omission. Id. at 52. The Court noted that Marram need not prove that he relied on the false statement or material omission, so his sophistication in financial matters was irrelevant to his claim. Id. at 53. Nor did Marram have any duty under the Act to investigate the false assertion or seek to verify its accuracy. Id. The Court characterized the contradictory written statements and the integration clause in the Subscription Agreement as “contract defenses.” Id. at 55. “(Tlhe existence of contradictory written statements, in an integration clause or otherwise, does not provide a defense to the charge of preinvestment materially misleading oral statements.” Id. The Court stated that “it is far from obvious that the representations in the offering memorandum and the subscription agreement contravene the specific, detailed oral representations that Kobrick is alleged to have made to Marram.” Id. But the Court also in essence declared that it would not matter if the written representations did contravene the earlier representations because “to permit the seller of securities to discharge, or to defeat, his statutory obligation of truthfulness to the buyer merely by attaching an integration clause to a subscription agreement would enfeeble the statute.” Id.
The Supreme Judicial Court also declared that an integration clause could not release a seller from liability under the Act for earlier false oral statements because the Act prohibits any person from waiving compliance with any provision of the Act. Id. at 56, citingG.L.c. 110A, §410(g). The Court treated the integration clause under the Subscription Agreement as effectively seeking a waiver from Marram of any violations under the Act made through earlier oral representations. Id. at 56-57.
The Court also ridiculed Kobrick’s argument that the oral representations were not material. Id. at 57-58. The Court declared:
Here the alleged oral misrepresentations relate to the diversification of the offshore fund, the industries in which the offshore fund was invested, the concentration of the offshore fund in certain industries, and the suitability (risk profile) of the offshore fund given the investment goal of the investor (capital preservation). It is difficult to imagine concerns more material to the reasonable investor when considered in the total mix of information that drives an investment decision.
Id. at 58.[1]
The Supreme Judicial Court’s decision in Marram vacating dismissal of the Complaint is plainly the “elephant in the room” as this trial court judge considers the many motions that are now before this Court, including the many dispositive motions. The Court will address each motion in turn.
*446 1. Kobrick Parties’ Motion for Summary Judgment
The defendants in Civil Action No. 01-2815 — Kobrick, Kobrick Offshore Fund, Ltd., and Kobrick Capital Management, LLC (collectively, the “Kobrick Parties”) — have again moved for summary judgment. This is the Kobrick Parties’ second motion for summary judgment; Judge van Gestel denied the first on June 13, 2006. In denying the first motion, Judge van Gestel also recognized the long shadow that the Supreme Judicial Court decision in Marram casts over this case:
The message to this Court from the SJC seems abundantly clear. These cases must be resolved by an evidentiary hearing, not by dispositive motions, unless the results of those motions are clear without doubt; and they are not on the present record . . . This Court must take a conservative approach on the pending motions in order to avoid yet another appeal that results in a further remand.
Memorandum and Order on Various Motions, June 13, 2006 at 11. The denial of summary judgment of the first motion for summary judgment, however, was expressly made without prejudice, since discovery had not been completed. Id. Discovery has since been completed, and this second motion has now been filed.
For the Kobrick Parties to prevail on their motion for summary judgment, they must demonstrate that Marram, as Trustee of the Plan, “has no reasonable expectation of proving an essential element of [the Plan’s] case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). As to the alleged claim of a securities law violation, that means that the Kobrick Parties must prove either that:
1. although Marram alleged in the Complaint that, prior to the Plan’s investment in the Fund, Kobrick made the false statements set forth earlier on page 3, there is no evidence in the record that Kobrick, in fact, made such statements, or, alternatively,
2. the evidence in the record is essentially undisputed that, if Kobick made those statements, Marram knew them at the time to be false (and therefore could not have been deceived by them).
As to the first proposition, it is plain from this Court’s review of the Marram deposition that there is evidence that, if believed by a jury, would show that Kobrick made the statements alleged. Marram testified at deposition that Kobrick said that his Fund was appropriate for a conservatively invested Plan since it “didn’t have very much high tech stocks in it... he understood my desire for not having much volatility ...” Later, when the Fund dropped in value, Marram testified that he asked Kobrick “why is it going down? and are we in tech stocks” . . . “and he assured me we were not in there, we were not in dot com stocks . . .” Id. at 39.[2]
As to the second proposition, while there is strong evidence that suggests that Marram should have known these statements were false, based on other information that he had read about Kobrick and the Fund and the provisions of the Subscription Agreement, there is plainly a dispute of fact as to whether he actually knew they were false. Consequently, this Court finds nothing new in this second motion for summary judgment that should yield a different result than the first motion. This second motion for summary judgment is also denied as to the alleged securities law violation.
As to the negligent misrepresentation claim, the Court in Marram observed that, generally, the presence of an integration clause, as a matter of law, means that any reliance on the prior oral representations is unreasonable. Id. at 59, quoting Sound Techniques, Inc. v. Hoffman, 50 Mass.App.Ct. 425, 433-34 (2000) (“no reasonable basis [existed] for ignoring the plain language of the merger clause, in which [the plaintiff] agreed that it was entering into the contract free from influence by or in reliance upon any representations other than those set out in the contract”). The Court, however, noted that such findings were generally made at summary judgment or after trial rather than on a motion to dismiss. Marram at 59-60. Not surprisingly, the Kobrick Parties observe that they are now moving for summary judgment, and it is therefore time to invoke this principle which, after all, is a matter of law. This Court would be inclined to agree with the Kobrick Parties if the Marram Court had also not declared:
[E]xtinguishing the plaintiffs negligent representation claim would be inappropriate because the subscription agreement implicitly acknowledges Kobrick’s preinvestment oral statements to be part of the mix of preinvestment information available for the prospective buyer to weigh. The private offering memorandum states that the offshore fund “will make available to each prospective investor ... the opportunity to ask questions of, and receive answers” from the offshore fund administrator concerning “the terms and conditions of this offering of Shares,” and from the offshore fund manager concerning “the investment program of the Fund.” The private offering memorandum further states that the administrator will provide the investor, on request, with such additional information “necessary to verify the accuracy” of the memorandum as the administrator “could acquire . . . without unreasonable effort or expense.” . . . Implicit in these representations is the guarantee that whatever information the agents of the offshore fund provide will be reliable. In essence, the subscription agreement and private offering memorandum implicitly vouch for the accuracy of Kobrick’s preinvestment oral statements to Marram about the offshore fund.
Id. at 60-61. By essentially finding that the prior oral representations were incorporated by reference into the Subscription Agreement and Private Offering Memorandum, the Supreme Judicial Court appears to have nullified in this case the general principle that a plaintiff may not bring a negligent misrepresentation claim based on prior oral representations that were not included in a *447 subsequent written agreement containing an integration clause. Since, viewing the evidence in the light most favorable to Marram, Kobrick made false prior representations to him, the only issue on summary judgment is whether there is sufficient evidence to support a finding of reasonable reliance. The evidence supporting the reasonableness of Marram’s reliance is indeed slim, but this Court cannot say that it is insufficient as a matter of law. Unless reliance is deemed unreasonable as a matter of law based on policy grounds, as it was in Sound Techniques, see 50 Mass.App.Ct. at 430-34, this question is generally left to juries. Consequently, the second motion for summary judgment is also denied as to the claim of negligent misrepresentation. Since a Chapter 93A claim can be based on an intentional or egregious negligent representation, see Marram at 62, the motion must also be denied as to that claim. As a result, the Kobrick Parties’ second motion for summary judgment is denied in its entirety.
2. Kobrick Parties’ Motion for Judgment on the Pleadings as to Count I
The Kobrick Parties have separately moved for judgment on the pleadings in Civil No. 01-2815-BLS1, contending that the Plan’s investment in Kobrick’s hedge fund was a private placement rather than a public offering, and therefore not covered under G.L.c. 110A, §410(a}(2). The Kobrick Parties no doubt have chosen to characterize this motion as a motion for judgment on the pleadings rather than a motion to dismiss, because it earlier moved to dismiss (and indeed litigated its motion to dismiss before the Supreme Judicial Court) without making this argument. Consequently, apart from the other problems they have in arguing this motion (which, as this Court will soon show, are insurmountable), they must also account for the fact that the Supreme Judicial Court in Marram knew full well that Kobrick characterized the sale of shares in his hedge fund as a private offering, see id. at 46-49, and that Kobrick was alleged to have violated G.L.c. 110A, §410(a)(2), and yet still held that Marram had a cause of action under the Act.
The Kobrick Parties correctly observe that the Supreme Judicial Court in Marram acknowledged that G.L.c. 110A, §410(a)(2), “is almost identical with §12(2) of the Securities Act of 1933, 15 U.S.C. §771(2).” Marram at 50-51, quoting L. Loss, Commentary on the Uniform Securities Act, official comment to §410(a), at 146 (1976). The Court also understood that “(t]he Legislature has directed that we interpret the act in coordination with the Securities Act of 1933.” Id. at 50. The Kobrick Parties, however, fail to observe that the language of G.L.c. 110A, §410(a) (2) differs in at least one material respect from the language of 15 U.S.C. §771(a)(2) — the federal statute includes within its scope “ [a]ny person who offers or sells a securiiy ... by means of a prospectus or oral communication” while the Massachusetts statute includes within its scope “any person who offers or sells a security . . .” Compare 15 U.S.C. §771(a)(2) with G.L.c. 110A, §410(a) (2).
Since a prospectus is generally understood as a document that a publicly traded corporation must provide to potential investors before offering stock in the corporation, the United States Supreme Court in Gustafson v. Alloyd Company, Inc., 513 U.S. 561, 575-76 (1995), held that the federal statute is limited to public offerings. Essentially, the Supreme Court found that this language limited the set of persons who offer or sell securities to the subset of those who offer or sell securities through a public offering. See Maldonado v. Dominguez, 137 F.3d 1, 8 (1st Cir. 1998); Yung v. Lee, 432 F.3d 142, 147-149 (2d Cir. 2005). The Massachusetts statute does not include this limiting language, and therefore, is not equally limited; by its plain language, it covers all who offer or sell a security. See Feldman v. Aspen Technology, 2007 WL 1089220 at *5, 22 Mass. L. Rptr. 341 (Mass.Super. 2007) (Garsh, J.) (“In contrast [with 15 U.S.C. §771(a)(2)], §410(a) (2) of the Act makes no reference to a prospectus and imposes liability on any person who ’offers or sells a security by means of any untrue statement of a material fact or any omission . . .’ G.L.c. 110A, §410(a)(2). Given this plain language, it would be inappropriate to imply a prospectus requirement into the Act and then to dismiss Count I on the basis that liability under §410(a) (2) is limited to public offerings of securities in which a prospectus is required.”).
Consequently, this Court finds that, even if the sale of securities here was a private placement (which Marram contests), the sale nonetheless is within the scope of G.L.c. 110A, §410(a)(2). The Kobrick Parties’ motion for judgment on the pleadings as to Count I, therefore, is denied.
3. The Kobrick Parties’ Motion to Dismiss Plaintiffs Claims Pursuant to Mass.R.Civ.P. 12(b)(1) and 12(h) where the Trust was Terminated over Two Years Ago and Plaintiff has Resigned as Trustee
The Kobrick Parties have also moved to dismiss the Plan’s claims under Mass.RCiv.P. 12(b)(1) and 12(h) because the Plan declared itself terminated in October 2005, and Marram has resigned as Trustee.
The facts relevant to this motion are not materially in dispute. On October 7, 2005, Science Applications International Corporation (“SAIC”) acquired Geo-Centers, with Geo-Centers merged into SAIC. As part of the acquisition, effective as of October 6, 2005, the administration of the Plan was divided into two Trusts, named “A” and “B.” Trust A held the Plan’s interest in the claims in this litigation; Trust B held all the remaining Plan assets, plus any additional assets added to the Plan apart from a settlement or judgment in this action. Marran was retained to serve as Trustee to Trust A; Vanguard Fiduciary Trust Company (“Vanguard”) was retained to serve as Trustee to Trust B. On that same date, the Plan declared its termination and commenced the process of termina *448 tion. No further employer contributions were to be made to the Plan; Plan participants were deemed fully vested; and the Plan, upon the conclusion of this litigation, was to liquidate and distribute its assets to the Plan participants. By no later than October 4, 2007, in settlement of litigation with the Department of Labor, Marram resigned as Trustee of Trust A, and Joseph Walkush was appointed Trustee in his place.
It is plain to this Court that the Plan legally still exists, although its administration has been divided in two, with Trust A being the beneficiary of any judgment or settlement in this action. Since the beneficiaries of Trust A are also the beneficiaries of the Plan, no substantive change relevant to this action has occurred that legally or equitably would justify dismissal. This Court, however, finds that a substantive change relevant to this action did occur when Marram resigned as the Trustee for Trust A, since after that date he no longer had the right to speak or act on behalf of the Plan. Once that occurred, Marram should have informed the Kobrick Parties and the Court of his resignation, and promptly moved for a substitution of the parties. That motion for substitution has only been filed in the wake of the Kobrick Parties’ motion.
Dismissal, however, is not an appropriate remedy for Marram’s delay in moving to substitute a new plaintiff. Under Mass.R-Civ.P. 17(a), “(n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for . . . substitution of the real party in interest. . .” Mass.R.Civ.P. 17(a). Here, although belated, Marram has moved to replace Walkush as the named Trustee. This Court allows the motion to substitute, and denies the motion to dismiss. To be clear, this motion to substitute only affects those claims brought by and against Marram in his capacity as Trustee of the Plan; it does not affect the counterclaims brought against him individually.
4. Kobrick Parties’ Motion for Sanctions
The Kobrick Parties have moved for sanctions for the alleged failure of the Plan, Marram individually, and SAIC to reveal to them until the hearing on the above motion to dismiss that the Plan had been divided into Trust A and B, and that Walkush had been appointed successor trustee on October 4, 2007. The motion for sanctions is allowed as to the Plan, but only in part, and denied as to Marram individually and SAIC.
On August 6, 2004, the Kobrick Parties served their First Request for the Production of Documents upon the Plan’s attorneys. Among the documents requested were:
each Plan document, along with all amendments, since the Plan’s original effective date;
each Trust instrument, along with all amendments, since the Trust’s original effective date;
all documents identifying the names of each of the Trustees of the Plan since its original effective date; and copies of all appointments and resignations of each Trustee who has ever served as a Trustee of the Plan.
The Plan provided the Kobrick Parties with these documents without objection. However, the Plan did not supplement its responses after the October 6, 2005 administrative division of the Plan into Trust A and Trust B.
At some time after its execution on August 6, 2007, Kobrick’s attorneys obtained a copy of Marram’s Settlement Agreement with the Department of Labor in which, without admitting liability, Marram agreed not to serve as a fiduciary for any ERISA-covered plan for at least five years. The Kobrick Parties then requested documents pertaining to the Department of Labor settlement with Marram, which Marram refused to provide, contending that they were irrelevant to this litigation. On October 19, 2007, Judge van Gestel allowed a motion to compel brought by the Kobrick Parties regarding these documents. In complying with this motion to compel, the Plan for the first time provided the Kobrick Parties with the documents, created at or about the time of the merger, that amended the Plan, commenced its termination, and appointed Vanguard as successor Trustee with respect to all Plan assets other than the claims against the Kobrick Parties, for which Marram remained as Trustee. In short, by the fall of 2007, the Kobrick Parties had received documents showing that the Plan was in the process of termination, that the Plan had been divided in two, and that Marram was the Trustee for the Trust whose sole purpose was to prosecute the instant litigation to conclusion. The Kobrick Parties also knew by this time that Marram had resigned as Trustee, although there was some confusion as to precisely when he had resigned. Marram’s attorney had informed the Department of Labor in writing on May 17, 2007 that Marram was “no longer the trustee of the Plan.” However, Marram testified at his deposition on November 19,2007 that he did not recall when he resigned as Trustee. He also testified that he did not know whether any person had been appointed to replace him as Trustee, and did not know who, if anyone, presently served as Trustee. The Kobrick Parties did not know and had not been told that the SAIC Board of Directors had appointed Walkush as successor Trustee to Trust A on October 4, 2007, and had not received the Board Resolution that reflected this appointment.
Based on the information in their possession, the Kobrick Parties on November 28, 2007 served their motion to dismiss, discussed above, based in part on their understanding that Marram had resigned as Trustee and that no person had been named to succeed him. The Kobrick Parties learned of Walkush’s appointment only in the Plan’s opposition to this motion, and did not receive a copy of the Board resolution until after the hearing on this motion.
Under Mass.RCiv.P. 26(e)(1), governing civil discovery:
*449 A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.
Mass.R.Civ.P. 26(e)(1). Here, the Plan’s response to the First Request for Production of Documents in 2004 was not incorrect when made, but the Plan should certainly have recognized that, when Marram resigned as Trustee and was replaced by Walkush, the response, at least as to the identity of the relevant Plan Trustee, was no longer true and had to be supplemented with the new Board Resolution to avoid a knowing concealment. While the change in Trustee did not require dismissal of the action, it was certainly material to the action, especially when the Trustee is the named party to the action and, therefore, notice should have been provided in discovery promptly after it occurred.
The Plan contends that sanctions are not warranted because the Kobrick Parties did not repeatedly specifically ask who the Trustees were, and therefore the Plan did not withhold any relevant discovery. It also contends that the actual identity of the Trustee is irrelevant, because the new Trustee did not participate in any of the conduct at issue. As to the first contention, Rule 26(e)(1) means that a party need not repeatedly submit additional discovery requests just to make sure that it learns of any material changes. This Court does not expect and does not want a party every six months to issue new discovery requests for the sole purpose of making sure that nothing has changed; the opposing party is supposed to supplement its earlier response to avoid the need for such repetition. As to the second contention, the change in Trustee is not irrelevant. The Plan could not continue this litigation without a Trustee, and the new Trustee should timely have been substituted as a party, so that the Kobrick Parties knew who was then acting on behalf of the Trust.
This Court allows the motion for sanctions against the Plan rather than against SAIC or Marram in his individual capacity, because the Plan was best positioned to provide this supplementation and bears the primaiy responsibility for failing to do so.
This Court is not persuaded that the remedy proposed by the Kobrick Parties is commensurate with the wrongdoing here in what this Court recognizes as a hotly-contested litigation battle. This Court does not see the need for the Plan’s counsel to execute special certifications; nor does it believe that the Plan’s argument against the imposition of sanctions was so frivolous that the Kobrick Parties should be awarded the attorneys fees they incurred in bringing the motion for sanctions. This Court, however, is persuaded that the Kobrick Parties should be awarded the attorneys fees and costs they incurred in preparing their motion to dismiss, since this motion would likely not have been filed had the Kobrick Parties learned that a successor Trustee had been appointed.[3] This Court will also give the Kobrick Parties the opportunity to depose Walkush, now that they know he is the successor Trustee
5. Kobrick Parties’ Motion to Preclude Plaintiff from Asserting New Theories of Written Misrepresentation and Plaintiffs Motion for Leave to Amend the Complaint
On September 28,2007, the Plan provided its Supplemental Response to the Kobrick Parties’ First Set of Interrogatories, in which it set forth the anticipated expert witness testimony of a financial consultant, E. Steven Scales (“Scales”). Scales identified ten purported misrepresentations which he contends Kobrick made before the Plan invested in the Fund, all of which were contained in a Powerpoint presentation that Kobrick made at a meeting on December 17,1999 with Marram and Brian Laveiy (“Laveiy’j, the Plan’s Administrator and Representative. The Kobrick Parties now move to preclude the Plan from asserting what it contends are these ten new theories of written misrepresentation. The Plan opposes the motion, but also moves to amend the Complaint specifically to allege these misrepresentations.
As noted earlier in this memorandum of decision, the original Complaint alleges that Kobrick essentially made four oral misrepresentations to Marram before the Plan invested in the Fund;
The Fund was diversified and was invested in a variety of industries;
High technology stocks did not constitute a majority of its holdings;
The Fund was not a volatile investment vehicle; and
The Fund was a suitable investment for the Plan’s portfolio.
This Court does not believe it is fair at this late juncture in the litigation, with discovery already closed, to permit the Plan materially to change the representations that have been the foci of this case. For instance, this Court will not allow the Plan to prevail in this case if it simply proves that Kobrick misrepresented that Michael Nance, a member of Kobrick’s management team, had previously worked for the Voyager Fund, or that Michael Carmen still worked for him as an investment manager. Nor, more generally, will this Court allow the Plan to prevail if it simply proves that Kobrick’s investment managers did not have the background or experience that he described or inferred.
At the same time, many of the ten so-called new theories of misrepresentation are not new theories at all — they are simply specific misrepresentations that fall within the rubric of the four more generalized misrepresentations already asserted. For instance, the alleged new misrepresentations regarding leverage fall within the rubric of volatility, since leverage is an important source of volatility. The alleged new misrepresentations that Kobrick used a “bottoms up” or a “capital appreciation” or a “long-term” stock selection strategy, rather *450 than market-timing, fall within the rubrics of volatility and suitability. The alleged new misrepresentations that Kobrick employed “risk controls” also fall within the rubrics of volatility and suitability. The alleged new misrepresentations as to Kobrick’s sale of high technology stocks and the nature of his holdings fall within the rubrics of diversification, of the percentage of high technology stocks, and of volatility. The alleged new misrepresentations regarding the nature of Kobrick’s investors fall within the rubric of the suitability of the Fund for the Plan. This Court will not bar these specific misrepresentations from being alleged and will therefore allow their inclusion in an Amended Complaint, but their inclusion will not change the fundamental fact that, to prevail at trial, the Plan will still need to prove one of the following misrepresentations:
The Fund was diversified and was invested in a variety of industries;
High technology stocks did not constitute a majority of its holdings;
The Fund was not a volatile investment vehicle;
The Fund was a suitable investment for the Plan’s portfolio.
With this caveat, this Court denies the Kobrick Parties’ motion to preclude the Plan from asserting new theories of written misrepresentation. The Court allows the Plan’s motion to amend the complaint, provided the Plan excise from the Amended Complaint the allegations in Exhibit A and B that concern the background, experience, or continued employment of members of Kobrick’s investment or management team.
6. Plan Parties’ Motion for Summary Judgment Against the Kobrick Parties’ Counterclaims and Third-Party Claims
The Kobrick Parties, through Counterclaims, a Third-Party Complaint, and a separate Complaint (Civ. No. 05-0672-BLS1), have brought a number of claims against the so-called “Plan Parties” — the Plan, Marram individually, and Lavery, specifically:
claims of negligent misrepresentation (Count I of the Counterclaims and Third-Parly Complaint), misrepresentation (Count II), violation of Chapter 93A (Count III), breach of contract (Count IV), and breach of the implied covenant of good faith and fair dealing (Count V) against the Plan and Marram individually;
a claim for contribution against Marram individually (Count VI); and
a claim for contribution or indemnification against Lavery (Civ. No. 05-0672-BLS1).
The Plan Parties move for summary judgment as to all these claims.
Most of these claims focus on the representations that Marram made on behalf of the Plan when he executed the Subscription Agreement, many of which have been reprinted earlier on page four of this decision. Essentially, the Kobrick Parties contend that Kobrick permitted the Plan to invest in the Fund only because Marram, on behalf of the Plan, agreed by executing the Subscription Agreement that:
the Plan relied solely on the written Fund documents in deciding whether to invest and not on any prior oral representations;
the Plan was capable of evaluating the risks of the Plan’s investment, did evaluate those risks, and determined that the investment was suitable for the Plan; and
the Plan would indemnify the Fund and its Investment Manager “against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon (a) any false representation or warranty or breach or failure by the Investor to comply with any covenant or agreement made by the Investor herein ... or (b) any action for securities law violations instituted by the Investor which is finally resolved by judgment against the Investor.
The Kobrick Parties claim that, since Marram now argues that he relied upon prior oral representations to proceed with an investment which he now contends was not suitable for the Plan, he has breached the representations he made on behalf of the Plan in the Subscription Agreement. As a result, the Kobrick Parties claim that the Plan must indemnify them for all the losses they have incurred as a result of this litigation, including their attorneys fees and the investment fees Kobrick lost because of the damage done to his reputation as an investment manager.
It is important to step back for a moment and consider the consequences of allowing these claims to prevail. According to the Kobrick Parties, even if Kobrick had made prior oral misrepresentations to Marram sufficient to constitute a violation of G.L.c. 110A, §410(a) (2), entitling the Plan to rescission of the investment and the award of its attorneys fees, the Plan would still lose because it had breached the representations contained in the Subscription Agreement, and would not only have to pay the Kobrick Parties the amount awarded through rescission, but also their attorneys fees, and the investment fees Kobrick lost from the damage to his reputation. This consequence would fly in the face of the Supreme Judicial Court’s decision in Marram, which expressly permitted the Plan’s securities act claim to proceed based on the alleged prior oral representations, knowing full well that the Subscription Agreement contained an integration clause and these written representations. The Supreme Judicial Court could not possibly have intended to allow this case to proceed so that the Plan could lose by winning.
In finding that a claim under G.L.c. 110A, §410(a)(2) may proceed despite the integration clause and writ *451 ten representations in the Subscription Agreement, the Supreme Judicial Court implicitly also found that those provisions may not independently be enforced to defeat the G.L.c. 110A, §410(a) (2) claim. Without that implicit finding, the explicit ruling in Marram, which was clearly meant to fulfil the Act’s provision of “strong protection for a buyer who received misleading information from a seller of securities,” Marram, 442 Mass. at 52, could be undone simply through the filing of a counterclaim. This Court finds it contrary to public policy and to the legislative purpose and spirit of the Act to enforce provisions in the Subscription Agreement which would permit the Kobrick Parties to recover damages even if they committed a violation of the Act through prior oral misrepresentations.
The Kobrick Parties have also made various claims for contribution, contending that, if they negligently made misrepresentations to the Plan, Marram and Laveiy, both of whom were fiduciaries of the Plan, were also negligent and should contribute to the payment of any damage award. This Court finds that these claims for contribution are barred under the ERISA preemption provision, 29 U.S.C. §1144(a), which supersedes “any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . .” 29 U.S.C. §1144(a). “State law” under ERISA is not limited to state statutes; it includes judicial decisions declaring the common law of the state. 29 U.S.C. § 1144(c) (“State law” includes “all laws, decisions, rules, regulations or other State action having the effect of law, of any State”). As the Supreme Judicial Court declared in Pace v. Signal Technology Corp.:
To determine whether State law, namely, the common law of misrepresentation, “relates to” an employee benefit plan and is thus preempted, we must look to Congress’s intent. “The purpose of Congress is the ultimate touchstone.” Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990), quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208, (1985). There can be no doubt that Congress intended that ERISA’s preemption provision be broadly construed. See Ingersoll-Rand Co., supra, 498 U.S. at 138; Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46-47 (1987). The provision’s “deliberately expansive” language was “designed to ‘establish pension plan regulation as exclusively a federal concern.’ ” Pilot Life Ins. Co., supra at 46, quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981). See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 98-100 (1983).
“A law ‘relates to’ an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.” Id. at 96-97. “Under this ‘broad common-sense meaning,’ a state law may ‘relate to’ a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect.” Ingersoll-Rand Co., supra, 498 U.S. at 139, quoting Pilot Life Ins. Co., supra, 481 U.S. at 47.
In spite of its undeniable breadth, ERISA’s preemption provision does not apply to every State action that affects an employee benefit plan. “Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law ‘relates to’ the plan.” Shaw, supra, 463 U.S. at 100 n. 21.
Pace, 417 Mass. 154, 156 (1994).
In Pace, the Supreme Judicial Court found that the claim of misrepresentation was not preempted, where the employer had mistakenly told a departing employee that, if he accepted the severance package, he would still be covered by the same insurance provided to employees, including long-term disability. Id. at 155. The Court found that, since the sole issue was whether the employee had been misinformed as to the benefits available under the employee benefit plan and the employee did not seek benefits under that plan, any award against the employer would not “directly affect the administration of benefits under the plan” and therefore did not relate to ERISA. Id. at 159-60, quoting Cuoco v. NYNEX, Inc., 722 F.Sup. 884, 887 (D.Mass. 1989).
Here, the alleged claim under the common law of negligence would directly relate to an ERISA plan because it would require a state court to determine the duty owed by these fiduciaries to an ERISA plan with respect to their investment of Plan monies. See Zipperer v. Raytheon Co., Inc., 493 F.3d 50, 53-54 (1st Cir. 2007) (finding that a negligence claim was preempted because it was based on the defendant’s record-keeping responsibilities under an ERISA plan); Donavan v. Robbins, 752 F.2d 1170, 1180 (7th Cir. 1985) (declaring it “extremely unlikely that Congress would have wanted ERISA fiduciaries to be subject to the vagaries of state contribution law”). Even if the Massachusetts common law of negligence were to mirror precisely the fiduciary duty owed under federal ERISA law governing the investment of ERISA funds, the mere possibility that it would differ and be in conflict with ERISA’s objectives is sufficient to require this state court to forbear from touching the contribution claim. See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656-59 (1995).[4]
The Kobrick Parties have also brought a contract claim that is contingent on their prevailing at trial, based on the provision in the Subscription Agreement in which the Plan agreed to indemnify the Kobrick Parties for any damages or expense, including attorneys fees and costs, incurred from “any action for securities law violations instituted by the Investor which is finally resolved by judgment against the Investor.” There can be no dispute as to the clarify of this provision — it provides that, if the Plan brings a securities claim against the Kobrick Parties and loses, it must pay their attorneys fees and costs and any other damages that they incurred.
The Kobrick Parties observe that a number of federal courts have been willing to enforce comparable *452 provisions and uphold the award of damages on comparable counterclaims. See Zissu v. Bear Stearns & Co., 627 F.Sup. 687, 691-93 (S.D.N.Y. 1986), aff'd on other grounds, 805 F.2d 75 (2d Cir. 1986); Samuels v. Wilder, 871 F.2d 1346, 1352 (7th Cir. 1989); and In re Integrated Resources Real Estate Limited Partnerships Sec. Litig., 815 F.Sup. 620, 677-78 (S.D.N.Y. 1993). They also observe that Zissu is perhaps the leading case addressing this issue, having been often cited.
In Zissu, a partner in a New York City law firm, who was also the chief executive of two public companies, had executed a document much like the Subscription Agreement that Marram executed, which contained representations and an indemnity provision much like those contained in that Subscription Agreement. Zissu, 627 F.Sup. at 690. The plaintiff brought federal securities claims, comparable to the state securities claim made here, alleging that he was induced to execute the subscription agreement by untrue statements of material fact and omissions of material fact contained in original and supplemental selling documents prepared by the defendants. Id. at 689. At trial, the plaintiff lost on his claims, and the defendants prevailed on their counterclaim for breach of warranty, which was comparable to the Kobrick Parties’ counterclaim for breach of contract, and were awarded their attorneys fees. Id at 690. After the verdict, the plaintiff argued that the award of attorneys fees could not stand because enforcement of the indemnification provision violated public policy, in that it would discourage other investors “from bringing suit to enforce any securities laws out of fear of having to pay attorneys fees to defendants, even if there were merit to the claim but the investor failed to carry his burden of proof.” Id at 692-93. The District Court did not mince its words in expressing its view of the plaintiffs complaint:
The only potential chilling effect is on those investors who make representations in a subscription agreement which they later repudiate. It would discourage such investors from using their own fraudulent conduct in order to bring unjustified lawsuits.
Id. at 693. In other words, the District Court agreed that enforcement of such indemnification provisions would have a chilling effect on plaintiffs who were contemplating securities claims, but it thought such a chill was appropriate and desirable, because it was only chilling to those investors who had breached the representations in the subscription agreement they executed and yet still brought securities claims.
As demonstrated in Marram, the very claims that, according to Zissu, never should have been brought are claims that state a cause of action under G.L.c. 110A, §410(a)(2). The Marram Court declared:
[T]he existence of contradictory written statements, in an integration clause or otherwise, does not provide a defense to the charge of preinvestment materially misleading oral statements . . . Indeed, to permit the seller of securities to discharge, or to defeat, his statutory obligation of truthfulness to the buyer merely by attaching an integration clause to a subscription agreement would enfeeble the statute.
Marram, 442 Mass. at 55. The Court found further support for this conclusion in another section of the Uniform Securities Act — G.L.c. 110A, §410(g ), which prohibits any person from waiving compliance with any provision of the Act. Id at 56. ‘To permit this remedy to be ‘waived’ or ‘released’ prior to or contemporaneously with the sale of unregistered securities would thwart the veiy objective of the statute and violate the declared public policy of this State. Such a holding would pave the way for the virtual nullification of this important legislative enactment.” Id at 57, quoting Foreman v. Holsman, 10 Ill.2d 551, 554, 141 N.E.2d 31 (1957). If the Supreme Judicial Court was not going to permit an integration clause in a Subscription Agreement to “enfeeble” the Act for fear that it would result in its “virtual nullification,” it certainly would not share Zissu’s view that the plaintiffs in these cases are simply investors repudiating written representations in a subscription agreement who should never have brought a securities claim. Put bluntly, Zissu recognizes that enforcement of the indemnification provision will chill these federal securities claims but it wants them chilled; Massachusetts law recognizes the chilling effect but does not wish to discourage comparable state securities claims.
This Court’s finding that the indemnification provision of the Subscription Agreement, including the “loser pays” clause, is unenforceable because it is contrary to public policy is supported by the difference between federal securities law and the Massachusetts Act with respect to the award of attorneys fees. Under federal securities law, after judgment enters in a securities case, “if the court believes the suit or the defense to have been without merit,” the court may assess costs, including reasonable attorneys fees, against the losing party. 15 U.S.C. §77k(e).[5] Under G.L.c. 110A, §410(a)(2), only the plaintiff investor, if he prevails, may be awarded attorneys fees. This distinction reflects the legislative recognition that, if the buyer bore the risk that he may have to pay the seller’s attorneys fees if he were to lose, the downside risk of bringing such a claim would discourage all but the most confident investors from invoking the protections of the Act.
The chilling effect of the “loser pays” provision regarding attorneys fees, as substantial as it is, pales in comparison to the chilling effect that would result from permitting the Kobrick Parties to prosecute their damage claims, in which they contend that they lost at least $77 million in expected earnings as a result of the damage to Kobrick’s reputation as an investment manager arising from this lawsuit. While this Court is skeptical that Kobrick could prove these damages, the fact remains, given the enormous amounts of money earned by investment managers, especially hedge fund managers, that even the fractional possibility of having to pay a damage award for the lost expected earnings of these managers *453 would discourage all but the wealthiest potential plaintiffs from calling investment managers to account for their purported misrepresentations. If, as the Marram Court proclaims, the Act is to continue to provide those who buy securities with strong protection against false or misleading statements, and is not to be enfeebled or effectively nullified by integration clauses, written representations, or indemnification provisions in subscription agreements, Massachusetts courts must reject the counterclaims and third-party claims brought against the Plan Parties. Therefore, for the reasons detailed above, the Plan Parties’ Motion for Summary Judgment as to the Counterclaims and Third-Party Claims is allowed.
7. Defendant Todd Ranter’s Renewed Motion for Summary Judgment
Todd Ranter (“Ranter”) in late 1999 through March 2000 worked as a broker at Donaldson, Lufkin & Jenrette (“DLJ”) and as manager of the Boston office of DLJ. According to the Complaint in Civ. No. 05-0672-BLS1, he was engaged by the Plan to advise it with respect to its investments, and advised the Plan to invest $1.5 million in the Fund in January 2000 and another $500,000 in March 2000. The Robrick Parties have brought a separate complaint for contribution against Ranter (and, as previously discussed, against Laveiy — Civ. No. 05-0672-BLS1), alleging that he provided negligent advice to the Plan and should contribute to any damage award that may issue against the Robrick Parties. Ranter earlier filed a motion for summary judgment, which was denied without prejudice in June 2006 by Judge van Gestel. With discovery now complete, he renews that motion.
While Ranter contends that he was simply a broker and therefore owed no duty to the Plan, this Court finds that there is a genuine issue of material fact as to whether he served as an investment advisor to the Plan during the relevant time period, and therefore owed a duty of care to the Plan. Consequently, Ranter may only prevail on this renewed motion for summary judgment if the evidence in the record is insufficient to prove that Ranter provided negligent advice to the Plan regarding its investment in the Fund.
Ranter attests that he did not learn of the Plan’s investments in the Fund until after the investments were made, and that he neither advised nor recommended that the Plan invest in the Fund. In searching the record for evidence to the contraiy, this Court notes that Marram testified at deposition that he “believed” he had Ranter look at the Offering Memorandum for the Fund prior to the Plan’s decision to invest in the Fund for the purpose of getting Ranter’s advice.[6] However, Marram could not recall if he spoke with Ranter about the Fund investment before making the investment or if Ranter provided him with any advice regarding that investment. Later in the deposition, Marram testified that Ranter had not recommended Robrick to him. When asked, “But he endorsed it, did he not?,” Marram answered, “Yes, he did.”
In short, the entirety of the record evidence against Ranter, viewed in the light most favorable to the Robrick Parties, is that:
Ranter served as an investment advisor to the Plan, although Marram did not recall if he was paid anything apart from transaction fees when DLJ purchased investments for the Plan.
Laveiy testified that he had used Ranter to advise about potential Plan investments in 1999 and 2000. He also testified that it was Marram’s practice to consult with Ranter before making any investment of Plan assets in 1999. Marram did not specifically tell him that he had consulted with Ranter regarding the Robrick Fund but “that would be what he would normally do.” He also said that it was “possible” that, at the meeting he and Marram had with Ranter on November 30, 1999, the Plan’s next investment was discussed, but he did not recall what was discussed at the meeting.
Ranter had earlier advised Marram and the Plan to purchase shares in the Ocelet Offshore Fund, a hedge fund similar in its investment approach to Robrick’s Fund.
Ranter and DLJ had prepared an Asset Allocation Analysis in December 1999 for the Plan, shortly before Marram decided to invest Plan monies in the Fund, which proposed that the Plan hold only ten percent of its assets in technology stocks.
Marram thought he had Ranter look at the Offering Memorandum for the Fund before Marram decided to invest Plan monies in it, and thought that Ranter had “endorsed it,” but could not recall receiving any advice from Ranter.
Marram thought that he had spoken to Ranter about Robrick’s investment histoiy as a fund manager before investing in the Fund and learned either from Ranter or Ron Tagiuri that Robrick had done well and was a good money manager. He did not recall specifically what Ranter had said about Robrick but recalled that “he wasn’t negative.”
Even generous inferences from this evidence would only reasonably permit a factfinder to conclude that Ranter, while serving as an investment advisor to the Plan, told Marram that Robrick was a successful money manager, received a copy of the Offering Memorandum, and did not affirmatively tell Marran not to invest in the Fund, which Marran understood as an endorsement. This evidence is not sufficient to give the Robrick Parties any “reasonable expectation of proving” Ranter’s negligence. See Kourouvacilis v. General Motors Corp., 410 Mass. at 716. Ranter’s Renewed Motion for Summaiy Judgment, therefore, is allowed.
ORDER
After hearing, for the reasons stated above, this Court ORDERS as follows:
*454 1. The Kobrick Parties’ Motion for Summary Judgment in Civil Action No. 01-2815-BLS1 is DENIED.
2. The Kobrick Parties’ Motion for Judgment on the Pleadings as to Count I in Civil Action No. 01-2815-BLS1 is DENIED.
3. The Kobrick Parties’ Motion to Dismiss Plaintiffs Claims under Mass.R.Civ.P. 12(b)(1) and 12(h) is DENIED. The Plan’s Motion for Leave to Substitute Party is ALLOWED. Walkush shall now be deemed the Trustee acting on behalf of the Plan. To be clear, this motion to substitute only affects those claims brought by and against Marram in his capacity as Trustee of the Plan; it does not affect the counterclaims brought against him individually.
4. The Kobrick Parties’ Motion for Sanctions is ALLOWED in part as to the Plan and DENIED as to SAIC and Marram individually. This Court shall award the Kobrick Parties the attorneys fees and costs they incurred in preparing (but not in arguing) their motion to dismiss. No later than February 20, 2009, the Kobrick Parties shall serve their application for attorneys fees and costs incurred in preparing the motion to dismiss. The Plan may serve its opposition no later than March 6, 2009. A hearing on this application shall be conducted on March 12,2009. In addition, if the Kobrick Parties wish to depose Walkush, they may do so no later than February 20,2009. Beyond that, the relief sought is DENIED.
5. The Kobrick Parties’ Motion to Preclude the Plan from Asserting New Theories of Written Misrepresentation is DENIED, with the caveat that, to prevail at trial, the Plan will still need to prove at least one of the following misrepresentations:
The Fund was diversified and was invested in a variety of industries;
High technology stocks did not constitute a majority of its holdings;
The Fund was not a volatile investment vehicle;
The Fund was a suitable investment for the Plan’s portfolio.
The Plan’s Motion to Amend the Complaint is ALLOWED, provided the Plan excise from the Amended Complaint the allegations in Exhibits A and B that concern the background, experience, or continued employment of members of Kobrick’s investment or management team.
6. The Plan Parties’ Motion for Summary Judgment as to the Counterclaims and Third-Party Claims is ALLOWED.
7. Kanter’s Renewed Motion for Summary Judgment in Civil Action No. 05-0672-BLS1 is ALLOWED.
8. This case is forthwith referred to mediation. In light of these rulings and the dramatic changes in the world financial climate, which likely will affect a jury’s perspective regarding this case, this case reasonably should settle short of trial. The parties will exhaust efforts to settle no later than March 6, 2009 and will inform the Session Clerk by that date as to whether the case has settled. If not, counsel shall be prepared at the March 12, 2009 hearing to provide the Court with dates on which counsel can be ready for trial.

This Court recognizes that the Supreme Judicial Court in Marram applied a standard for evaluating a motion to dismiss that it later “retired” in Iannacchino v. Ford Motor Company, 451 Mass. 623, 636 (2008). In Marram, the Court declared, “In evaluating the allowance of a motion to dismiss, we are guided by the principle that a complaint is sufficient ‘unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.’ ” Marram, 442 Mass. at 43, quoting Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998), which quoted Nader v. Citron, 372 Mass. 96, 98 (1977), which quoted Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The Court in Iannacchino retired that standard because it would permit wholly conclusory allegations to survive a motion to dismiss, and replaced it with the following standard:
While a complaint attacked by a... motion to dismiss does not need detailed factual allegations ... a plaintiffs obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . .
Iannacchino, 451 Mass. at 636, quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007). This Court, however, does not believe that the Marram decision would have come out differently if the Supreme Judicial Court had applied the Iannacchino standard, because Judge van Gestel’s dismissal was not based on the conclusory nature of the allegations but on the unreasonableness of Marram’s reliance on oral statements that were contradicted by the subsequent written Subscription Agreement, which expressly provided that its representations superceded any prior oral representations.

Manram also testified that he specifically asked Kobrick if the Fund had much in high tech stocks because that was an area he did not want to invest in, and Kobrick replied that “we do not have much in high tech.”

Since many motions were argued at the hearing, this Court does not award any attorneys fees with regard to the hearing of the motion to dismiss.

This Court notes that, even without ERISA preemption, it is doubtful that the Kobrick Parties would have a right to contribution with respect to the claim under G.L.c. 110, §410(a)(2) because the only remedy available under that statute is rescission — the investor gets back the amount he paid, plus six percent interest, and attorneys fees. This Court does not see how a joint tortfeasor could contribute to the equitable remedy of rescission, especially since the seller would regain ownership of the securities sold and the joint tortfeasor reasonably would not receive half of these shares. This legal issue, however, is mooted by the Court’s finding of ERISA preemption.

Indeed, when Zissu was appealed, the Second Circuit held that the indemnification provision in the subscription agreement was too vague to put the plaintiff on notice that he might have to pay the defendants’ attorneys fees, but upheld the award of attorneys fees under 15 U.S.C. §77k(e) because the lawsuit was frivolous. Zissu, 805 F.2d 75 (2d Cir. 1986).

When later asked whether he had asked Kanter to review the Offering Memorandum for him, Marram testified, “I think I did.”